By the Court.
 

 The outstanding fact which must first be stated as underlying and conditioning every element involved in this controversy is as stated in the 1931 annual report of the Columbia Gas
 
 &
 
 Electric Corporation, that all of the properties involved in this case are “thoroughly integrated and interconnected, they constitute a single operating unit.”
 

 With the exception of the qualifying shares, the Columbia Gas
 
 &
 
 Electric Corporation, which is the parent corporation of this group, holds the entire common stock of the United Fuel Gas Company. This company, a resident of West Virginia, produces gas outside of the state and sells it at the Ohio river at wholesale rates to the Ohio Fuel Gas Company. The Ohio Fuel Gas Company in turn mingles this gas bought from the United Fuel Gas Company with gas produced by the Ohio Fuel Gas Company and with other gas produced by independent producers in the
 
 *114
 
 state, and then transmits' this gas to various points both within and without the state of Ohio, selling certain gas directly to consumers, and selling certain gas to distributing companies, as in this case. With the exception of the qualifying shares, all of the common stock of the Ohio Fuel Gas Company is owned by the Columbia Gas & Electric Corporation.
 

 The Columbus Gas & Fuel Company, one of the distributing companies supplied by the Ohio Fuel Gas Company, is likewise owned by the Columbia Gas & Electric Corporation.
 

 Another part of the picture is that the Columbia Engineering
 
 &
 
 Management Corporation, a subsidiary of the Columbia Gas & Electric Corporation,.furnishes certain engineering and management service to the United Fuel Gas Company, the Ohio Fuel Gas Company, and the Columbus Gas & Fuel Company. A direct cost charge is made by the Columbia Engineering & Management Corporation for engineering services, and two and one-half per cent, of the gross earnings is charged for executive management of each subsidiary of the parent company.
 

 In
 
 Smith
 
 v.
 
 Illinois Bell Telephone co.,
 
 282 U. S., 133, 51 S. Ct., 65, 75 L. Ed., 255, the Supreme Court- of the United States has recently held that a federal District Court has jurisdiction to determine the profits which may reasonably accrue to a related company which sells its product to a public utility and to find the cost of any engineering or management service rendered by the parent company or any subsidiary to a public utility. This holding has been reiterated and even emphasized in
 
 Western Distributing Co.
 
 v.
 
 Public Service Commission of Kansas,
 
 285 U. S., 119, 52 S. Ct., 283, 76 L. Ed., 655, as late as February 29, 1932. In that case, discussing a gate rate, the Supreme Court said:
 

 “Where, however, they constitute but a single interest and involve the embarkation of the total capital
 
 *115
 
 in what is in effect one enterprise, the elements of double profit and of the reasonableness of inter-company charges must necessarily be the subject of inquiry and scrutiny before the question as to the lawfulness of the retail rate based thereon can be satisfactorily answered. * * * It is enough to say that in view of the relations of the parties, and the power implicit therein arbitrarily to fix and maintain costs as respects the distributing company which do not represent the true value of the service rendered, the state authority is entitled to a fair showing of the reasonableness of such costs, although this may involve a presentation of evidence which would not be required in the case of parties dealing at arm’s length and in the general and open market, subject to the usual safeguards of bargaining and competition.”
 

 We approach the decision of questions herein presented in the light of the principles laid down by the Supreme Court of the United States and by this court. 11 is not the function of this court to fix rates. Under Ohio law, the city of Columbus has power to fix rates by ordinance, and did so fix the rate involved herein. The specific question is whether the rates so fixed are unreasonable, unlawful, and confiscatory. Upon that question the utilities have the burden of proof.
 

 As stated by Mr. Chief Justice Hughes in the case of
 
 Los Angeles Gas & Electric Corp.
 
 v.
 
 Railroad Commission of California,
 
 289 U. S., 287, 53 S. Ct., 637, 77 L. Ed., 820, decided May 8, 1933: “That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof and the Court may not interfere with the exercise of the State’s authority unless confiscation is. clearly established. ’ ’
 

 The specific question confronting us is the question whether the ordinance, enacted by the council of the city of Columbus and approved by a majority of the electors voting thereon in' referendum, establishes a
 
 *116
 
 rate which is unreasonable, unlawful and confiscatory. Section 614-46, General Code;
 
 Hocking Valley Ry. Co.
 
 v.
 
 Public Utilities Commission,
 
 92 Ohio St., 362, 110 N. E., 952.
 

 We start with the proposition that we deal here with properties admitted by the utilities to be thoroughly integrated and interconnected, constituting a single operating unit. In addition, the highest court of the country has held that the commission and this court have jurisdiction to inquire into the reasonableness of the profits secured by parent companies, or by related companies, or by engineering and management companies, in a situation such as this.
 

 Conceding the fact that, as this product is private property, the utilities are entitled to a profit in the distribution of the product, the fact also remains that under the holdings of the United States Supreme Court, the utilities are under an obligation to render fair and equal service at a rate which will produce a just and fair return for the sale of the product.
 

 The River Rate.
 

 The majority of the commission found that a reasonable and lawful rate per M c. f. was 22.04 cents. The minority finding was 17.79 cents on the same rate. The valuations and the expense and return on investment, found for the purpose of fixing this particular part of the rate by both the majority and the minority of the commission, were the same, with the exception of two items, both under the same general heading of expenses and return on investment. The majority of the commission found the production expenses to be $1,678,480, and the portion allocable to the Ohio Fuel Gas Company on M c. f. sales basis to be $608,053. The minority of the commission found production expenses to be $832,524, and the portion allocable to the Ohio Fuel Gas Company on M c. f. sales basis, $301,-594. The majority of the commission then allowed for
 
 *117
 
 depreciation and amortization $1,877,282, and the portion allocable to the Ohio Fuel Gas Company to be $680,071, and the minority made an allowance for the same item of $906,437, the portion allocable to the Ohio Fuel Gas Company for this item being $328,370. These two substantial differences resulted in the difference above set forth in the rate to be paid at the river for the gas delivered by the United Fuel Gas Company into the mains of the Ohio Fuel Gas Company, and thence to the Columbus Gas & Fuel Company for consumption in this city.
 

 The difference between the majority and the minority of the commission with reference to the item of production expenses lay in the difference of their treatment of delayed rentals. The majority of the commission was of the view that as these were the figures presented before the West Virginia Commission in a gas rate ease involving the property of the United Fuel Gas Company located in West Virginia, which testimony was offered entire in this hearing as evidence bearing upon the valuation of this property, the commission was compelled to make the same allowance for delayed rentals entering into production expenses as the West Virginia commission.
 

 The minority of the commission found the same valuation of the physical property, but considerably diminished the allowance for delayed rentals upon the ground that under Ohio law there can be no allowance for delayed rentals in the case of nonproducing acreage.
 

 With this conclusion of the minority of the commission we are in accord.
 

 It was held by this court in the case of
 
 Logan Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 121 Ohio St., 507, 169 N. E., 575, that under the Ohio statutes, Sections 499-8, 499-9, 614-20, 614-23, etc., General Code, which order the valuation of a public utility upon the basis only of property used and useful for the public service,
 
 *118
 
 there can be ho allowance in valuation for nonproducing acreage. When the question is the rate which is to be paid in Ohio for gas delivered in Ohio, even if it comes from West Virginia, Ohio law must govern the valuation and rate based thereon.
 

 With reference to the item of depreciation and amortization, the West Virginia commission allowed 1.12 per cent, for depreciation and 4.15 per cent, for amortization. These figures were carried over into their findings by the majority commission-. We hold elsewhere in this opinion that amortization cannot be allowed under Ohio law. The Ohio statute provides for an allowance for depreciation but not for amortization. Section 499-9, General Code. The commission has no discretion in adding items of valuation not specified by the Legislature.
 

 We therefore find that the river rate of 17.79 cents for gas delivered from West Virginia, fixed by the minority of the commission, is not unreasonable, unlawful, nor confiscatory.
 

 The Gate Rate.
 

 The next question which we approach is the reasonable rate which is due to the Ohio Fuel Gas Company for the gas which it supplies to the Columbus Gas
 
 &
 
 Fuel Company. The two most important questions to be decided in this particular are what shall be the proper allocation of the Ohio Fuel Gas Company’s property used and useful in furnishing gas to the city of Columbus, and what is the value of its gas-producing leaseholds.
 

 Allocation.
 

 The city contends that production property of the Ohio Fuel Gas Company should be allocated upon the basis of sales, but that the transmission property should be allocated to the particular market in this locality upon the basis of mileage multiplied by the peak demands of the particular municipality. The
 
 *119
 
 company contends, however, that there should he no particular allocation either of the production or transmission property, to any one market except upon the basis of sales or consumption of gas. The city contends that this theory of allocation results in a statewide gate rate, that is, the same gate rate for each community in the state served directly or indirectly by the Ohio Fuel Gas Company, and that the city of Columbus is entitled to such a gate rate as is required by its demands and load factor and its distance from the source of supply. Both the majority and the minority holding of the Public Utilities Commission were in favor of the company upon this point.
 

 The demand-mileage allocation method is not untried. It has been used in West Virginia.
 
 In re United Fuel Gas Co.,
 
 P. U. R., 1918C, 193;
 
 In re West Virginia Central Gas Co.,
 
 P. U. R., 1918C, 453;
 
 In re United Fuel Gas Co.,
 
 P. U. R., 1920C, 583;
 
 In re Hope Natural Gas Co.,
 
 P. U. R., 1921E, 418.
 

 This method was used in
 
 United Fuel Gas Co.
 
 v.
 
 Railroad Commission of Kentucky
 
 (D. C.), 13 F. (2d), 510, a case affirmed by the Supreme Court of the United States in 278 U. S., 300, 49 S. Ct., 150, 73 L. Ed., 390, upon another point.
 

 In the case in 13 F. (2d), Judge Hickenlooper said at page 522: “It therefore now becomes necessary that the determined rate base and the operating expenses be apportioned to the localities with which we are particularly concerned. We are of the opinion that production expenses and valuation, general property valuation, general expenses, and working capital should be apportioned on the proportionate sales basis, transmission, system valuation, and expenses upon the demand mileage basis, ‘and distribution upon actual-valuation of the distribution plants in the several municipalities and actual expenses there incurred.”
 

 The court is impressed with the fact that in this state the unit established by the Constitution for deal
 
 *120
 
 ing with public utility service is the municipality. Article XVIII, Sections 4 and 5. This circumstance was held to have great weight in Indiana, where the demand of various utilities that a common gate rate be fixed was denied upon the ground that in Indiana the city, and not the system, is the unit.
 
 Wabash Valley Electric Co.
 
 v.
 
 Singleton
 
 (D. C.), 1 F. Supp., 106;
 
 Indiana General Service Co.
 
 v.
 
 McCardle
 
 (D. C.), 1 F. Supp., 113. The
 
 Wabash Valley Electric Co. case
 
 was reviewed by the Supreme Court of the United States,
 
 Wabash Valley Electric Co.
 
 v.
 
 Young,
 
 287 U. S., 488, 53 S. Ct., 234, 77 L. Ed., 348, and the opinion of the court was delivered upon January 9, 1933. The question of allocation was considered in the case, Mr. Justice Sutherland delivering the opinion of the court. We quote a pertinent part of the decision upon the question of allocation, as follows:
 

 ‘ ‘ The court below held that under the provisions of the state statute and in the light of the facts, not the entire property and system of appellant, but. the City of Martinsville alone should be treated as the unit for the purpose of determining the schedule of rates to be charged therein. The commission, as well as the master, had reached the same conclusion. * * *
 

 “Appellant’s chief contention is that its entire operating property should be taken as a unit in fixing the rate base, and that the action of the court in failing to do so deprived it of its property without due process of law.”
 

 The court cites a decision of the Supreme Court of Wisconsin,
 
 City of Eau Claire
 
 v.
 
 Wisconsin-Minnesota Light & Lower Co.,
 
 178 Wis., 207, 220, 189 N. W., 476, which determined that the Wisconsin commission was required to treat the municipality as a’unit and to base its rate upon the cost to the utility of serving the individual municipality rather than the average cost of serving many distinct and scattered municipalities. Mr. Justice Sutherland, summarizing the decision of
 
 *121
 
 the Wisconsin court, points out that the Legislature must have regarded the municipality as the entity on the one hand and the utility as the entity on the other, for the purpose of establishing just and reasonable rates and service, and then states: ‘ ‘ Since the Indiana act was patterned after the Wisconsin act with a like history and attended by similar circumstances, the court below felt warranted in following the decision of the Wisconsin court; and with that view we see no reason to disagree.”
 

 Every árgument that can be made in Indiana and Wisconsin with reference to the legislative policy of regarding the municipality as the entity to deal with the utility for the purpose of establishing just and reasonable rates and service may be and is reiterated here under the far-reaching Home Buie provisions of the Ohio Constitution.
 

 Just why the city of Columbus should be charged for the pipe lines extending to Indiana, to Toledo, and to Cincinnati, we cannot understand. By the preponderance of the evidence, the transmission lines north and northeast of Columbus do not contribute to the Columbus gas supply, and the gas rate in Columbus should not share any part of the cost, maintenance or depreciation of these lines. The test is what portion of the wells, the compressor stations, and the pipe lines is devoted to each city or community, and the method of allocation adopted by the majority and the minority of the commission was erroneous. If the proper method of allocation had been adopted, the gate rate found would have been materially decreased.
 

 We hold that the unit of allocation in this case is not the system, but the locality, and quoting Judge Hickenlooper,
 
 supra,
 
 that “production expenses and valuation, general property valuation, general expenses, and working capital should be apportioned on the proportionate sales basis, transmission, system valuation, and expenses upon the demand mileage basis, and dis
 
 *122
 
 tribution upon actual valuation of the distribution plants in the several municipalities and actual expenses there incurred. ’ ’
 

 Leaseholds.
 

 The next question which arises is as to the fair valuation of the leaseholds owned by the Ohio Fuel Gas Company and used in the conduct of its business. This court has held in a previous valuation case that the method of using cost to determine value of leaseholds did not give due regard to the value of the property used and useful. No valuation, can be based upon market price because of the fact that there is no market for a gas property so extensive as that of the Ohio Fuel Gas Company.
 

 In the case of
 
 Logan Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 121 Ohio St., 507, 169 N. E., 575, classes 2, 3 and 4 leaseholds (non-producing) were excluded from the valuation upon the ground that the property was not used and useful, and that decision was sustained by this court. In the case of
 
 Logan Gas Co.
 
 v.
 
 Public Utilities Commission, 124
 
 Ohio St., 248, 177 N. E., 587, this court in a
 
 per curiam
 
 opinion sustained the commission in basing its valuation of class No. 1 leaseholds (producing) under Section 499-9, General Code, upon book value and not upon market value. Because the valuation found in the
 
 Logan Gas Company case
 
 was $25 per acre, both the majority and the minority of the commission in this case fixed a valuation upon class No. 1 leaseholds (producing) of $25 per acre, it being conceded in each finding that this valuation is approximately $2,500,000 more than the present book value of all leaseholds of the Ohio Fuel Gas Company and the Logan Gas Company combined, eliminating, as stated in the minority opinion, the “arbitrary write up” of approximately $3,700,000 in the Logan Gas Company’s leaseholds made during 1919. In valuing these leases at more than the book value under this
 
 *123
 
 record, the commission was in error. The commission was also in error in including in its valuation the book value of all leaseholds. Only the present book value of class No. 1 leaseholds (producing) may be allowed.
 

 It was held in
 
 United Fuel Gas co.
 
 v.
 
 Railroad Commission of Kentucky, supra,
 
 that for rate base purposes, gas acreage belonging to a natural gas company should be valued at its book value rather than on the basis of its earning capacity. The court adverts to the fallacy of the argument that because of the earning capacity and large return allowed, the property has greatly increased in value, and that such increased value should thereupon be taken as the basis of another calculation of a still larger return. The holding of that case was affirmed by the United States Supreme Court in the case of
 
 United Fuel Gas Co.
 
 v.
 
 Railroad Commission of Kentucky,
 
 278 U. S., 300, 49 S. Ct., 150, 73 L. Ed., 390.
 

 This same fallacy has been pointed out by Mr. Justice Hughes in the
 
 Minnesota Rate Cases,
 
 230 U. S., 352, 33 S. Ct., 729, 57 L. Ed., 1511, 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916A, 18, and by Mr. Justice Brandéis in his concurring opinion in
 
 State of Missouri, ex rel. Southwestern Bell Telephone Co.,
 
 v.
 
 Public Service Commission of Missouri,
 
 262 U. S., 276, 43 S. Ct., 544, 67 L. Ed., 981, 31 A. L. R., 807.
 

 The court in
 
 United Fuel Gas Co.
 
 v.
 
 Railroad Commission of Kentucky, supra,
 
 felt itself constrained, in the absence of market value, and under the rule just stated that earning capacity should not be taken into consideration for establishment of the rate basis, to hold that the best, if not the only evidence of value in the record was the book value.
 

 In view of this holding, of the United States District Court, and the specific holding of this court in
 
 Logan Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 124 Ohio St., 248, 177 N. E., 587, we hold that the value of class No.
 
 *124
 
 1 leases should be reduced to book value, and reduced to the book value of class No. 1 leases alone.
 

 Going Concern.
 

 The members of the commission were unanimous in the disallowance of going concern value as a separate item. In a number of cases this court has affirmed such action by the commission.
 
 City of Cincinnati
 
 v.
 
 Public Utilities Commission,
 
 113 Ohio St., 259, 148 N. E., 817;
 
 Hardin-Wyandot Lighting Co.
 
 v.
 
 Public Utilities Commission,
 
 118 Ohio St., 592, 162 N. E., 262;
 
 Logan Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 121 Ohio St., 507, 169 N. E., 575. Similarly the Supreme Court of the United States in a recent case,
 
 Los Angeles Gas S Electric Corporation
 
 v.
 
 Railroad Commission of California, supra,
 
 refused a going value claim of approximately nine million dollars.
 

 This court is of the opinion that in the instant case this refusal was proper.
 

 Taxes and Overheads.
 

 Upon the allowances made for taxes and general and direct overheads, we have given careful consideration to the opinion of both the majority and the minority of the Public Utilities Commission and have reached the conclusion, upon the entire record, that while there is no great difference between the majority and minority findings as to values and percentages taken, the figures presented and estimates made by the minority report are fair and just.
 

 We are not unmindful of the economic conditions which now exist and which have existed since the beginning of this rate case and prior thereto. It is our conclusion that the record requires that the findings of the minority report upon the question of taxation and general and direct overhead be found to be reasonable and lawful.
 

 Attention may be called to the case of
 
 Los Angeles
 
 
 *125
 

 Gas & Electric Corp.
 
 v.
 
 Railroad Commission of California,
 
 289 U. S., 287, 53 S. Ct., 637, 77 L. Ed., 820, decided by tbe Supreme Court of the United States on May 8, 1933. Tbe opinion in that case, relative to the value of gas plant properties, states: “The estimates of present value, taken as the cost of reproduction as of December 31, 1929, based upon average prices from 1926 or 1927 to 1929, furnished no dependable criterion of values in the succeeding years. The country was facing a most serious decline in prices. It was entering upon a period of such depression as to constitute ‘a new experience to the present generation.’ ”
 

 Much that is said in the opinion is relevant in this case: “The actual cost of the property — the investment the owners have made — is a relevant fact.
 
 Smyth
 
 v.
 
 Ames,
 
 169 U. S., 466, 547 [18 S. Ct., 418, 42 L. Ed., 819]. But, while cost must be considered, the Court has held that it is not an exclusive or final test. The public have not underwritten the investment. The property, on any admissible standard of present value, may be worth more or less than it actually cost. The time and circumstances of the outlay, and the effect of altered conditions demand consideration. Even when cost is revised so as to reflect what may be deemed to have been invested prudently and in good faith, the investment may embrace property no longer used and useful for the public. This is strikingly illustrated in the present case, where the Company has a large gas manufacturing plant which, in view of the supply of natural gas, has not been used for several years and is not likely to be used for many years to come, if at all. But no one would question that the reasonable cost of an efficient public utility system ‘is good evidence of its value at the time of construction.’ We have said that ‘such actual cost will continue fairly well to measure the amount to be attributed to the physical elements of the property so long as there is no change in the level of applicable prices.’
 
 McCardle
 
 v.
 
 *126
 

 Indianapolis Water Co.,
 
 272 U. S., 400, 411 [47 S. Ct., 144, 148, 71 L. Ed., 316]. And when such a change in the price level has occurred, actual experience in the construction and development of the property, especially experience in a recent period, may be an important check upon extravagant estimates.”
 

 Depreciation and Amortization.
 

 Depreciation is the reduction of worth. Amortization is the extinguishment of an existing debt or claim by means of a fund created for that purpose.
 

 Sections 499-8, 499-9 and 614-46, General Code, deal particularly with the legislative processes that the Public Utilities Commission must use in evaluating the properties of public utilities. Section 499-8, General Code, provides that when the commission deems it necessary it may “investigate and ascertain the value of the property of any public utility used and useful for the service and convenience of the public.” Section 499-9, General Code, provides how the valuation shall be made. This section provides that the report of the commission on value shall show certain facts as specified in paragraphs A to H, inclusive. Paragraph E deals with “depreciation,” as follows: “Depreciation, if any, from the new reproductive cost as of a date certain, for existing mechanical deterioration, for age, for obsolescence, for lack of utility
 
 or for any other cause,
 
 the percentage and amount of each class of depreciation, if any, to be specifically set forth in detail.”
 

 Paragraph D deals with new production, as follows: “The cost of new production as of a date certain, of all physical property other than land, owned and used by such public utility or railroad, showing the values of the separate items comprising such property, together with the unit basis of such valuation.”
 

 Paragraph P provides that: “The net value as of a date certain, of all physical property other than land
 
 *127
 
 owned by such utility or railroad, to be derived by deducting tbe sum of tbe amounts of depreciation from tbe sum of tbe new reproductive costs. ’ ’
 

 We are not losing sight of the theory of “accrued and future depreciation,” and we are not hostile to the doctrine that accrued depreciation should not be deducted from the sum of the new reproductive costs.
 

 In considering the items of depreciation and amortization we are keeping in mind Section 614-46, General Code, which provides that the rate fixed by the Public Utilities Commission shall be “fair and reasonable.”
 

 Section 614-49, General Code, provides for the carrying of a depreciation account by public utilities.
 

 Section 614-50, General Code, provides that money set aside for depreciation purposes must be expended for such purposes and no other, except upon the approval of the Public Utilities Commission.
 

 There is no provision for amortization under the laws of Ohio. Where the life of a utility’s product is uncertain, can it be intelligently and fairly amortized? We think not.
 

 The contention that there should be an allowance by way of amortization sufficient to return the entire investment of .the company to the stockholders during the period of the life of the business is untenable, as the business has no fixed life.
 

 As bearing on the question of the certainty of the life of the business, the gas company places much stress on the testimony of practical gas men, to the effect that they could not predict a longer life than twenty-five years for the company. Practical experience teaches us that this is a mere prophecy. The gas business will continue so long as natural gas can be taken from the earth in the fields controlled by the parent corporation, in paying quantities. History along this line reveals the fact that the testimony of experts as to the probable life of natural gas is un
 
 *128
 
 reliable, and it is for this reason that amortization is guesswork. An allowance for amortization such as contended for by the company would place an unwarranted burden upon the present consumers of gas. The stockholders of the gas company at no time had any right to anticipate that the law would, in addition to dividends, at some time hand them back their original investment. The nature of the natural gas business has been precarious at all times; but so long as it has continued to function, its returns have been reasonably liberal.
 

 Capital does not feel its way to an enterprise in this day and age. Investors investigate the vices and virtues of a proposition before investing. Public utilities, and natural gas companies in particular, advance the theory that they are public servants, furnishing the public with a perishable commodity; that their product is short-lived; that when their product dies they are left with an expensive property that cannot be utilized for other purposes; and that it is only fair, during the life of the company, that- its investment should be returned to it by way of amortization.
 

 That the product natural gas will eventually die is self-evident. When it will die is an assumption. An assumption is no stronger than the facts that support it, and it is just and fair to assume that much of the equipment now used in the transportation and distribution of natural gas will be utilized for the transportation and distribution of artificial gas in the future.
 

 We must accredit to the men who organize and manage public utility corporations in which millions are invested, a higher degree of intelligence and a keener foresight than that of the ordinary individual. Hence to say, or even to think, that upon the failure of natural gas the entire property of a natural gas company would be scrapped would be a puny tribute to those responsible for its conduct.
 

 The evaluation of the property of a public utility is
 
 *129
 
 governed solely by tbe statutes of Ohio. The Public Utilities Commission of Ohio is the agency employed by the state in making valuations and fixing thereon rates of return. In the exercise of this power, does it have a discretion?
 

 Depreciation is an incident to valuation. In considering the item of depreciation the court takes judicial cognizance of the fact that the trend of material and labor cost is downward. The case of
 
 Bluefield Water Works & Improvement Co.
 
 v.
 
 Public Service Commission of West Virginia,
 
 262 U. S., 679, 43 S. Ct., 675, 67 L. Ed., 1176, is followed and approved in the case of
 
 Los Angeles Gas & Electric Corporation
 
 v.
 
 Railroad Commission of California, supra.
 
 In the opinion, Chief Justice Hughes quotes the
 
 Bluefield Water Works case,
 
 as follows: “A ‘public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures.’ ”
 

 It will be remembered that the Supreme Court of the United States in this case was considering but one question, “Was the rate fixed by the Railroad Commission confiscatory?” It disclaims all supervisory power. This court has none other than a supervisory jurisdiction in cases of this character, as provided by Article TV, Section 2, of the Constitution of Ohio, and conferred by Sections 544
 
 et seq.,
 
 General Code.
 

 Counsel for the gas company, in their brief in case No. 23868, quote from the case of
 
 Board of Public Utility Commissioners
 
 v.
 
 New York Telephone Co.,
 
 271 U. S., 23, 46 S. Ct., 363, 70 L. Ed., 808: “Customers pay for service, not for the property used to render it.
 
 *130
 
 Their payments are not contributions to depreciation or other operating .expenses, or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of moneys received for. service belongs to the company, just as does that purchased out of proceeds of its bonds and stocks.”
 

 We have no quarrel with this law, but we find in it no argument in favor of amortization. If amortization is to be allowed this company, it should be based on the probable life of the business and not on the probable life of its producing wells. The commission did allow $4,158,954 for amortization annually, based upon a life expectancy of three years and two months for producing wells. It is conceded that the life of the company will be at least twenty-five years. Hence, if amortization was allowable under the laws of Ohio, it should be spread over the twenty-five years. Unless amortization can be converted into some sort of depreciation there is no authority in law for such a charge in this state.
 

 It may be insisted that unless a reasonable amount is allowed annually for amortization a fair rate basis cannot be attained. That may be true, but the Legislature has prescribed a valuation formula. If this formula is unfair to the utility, unless and until it reaches the point of confiscation, the remedy is with the Legislature and not with the courts.
 

 We find that the majority report of the Public Utilities Commission treats “depreciation” and “amortization” as one item. It states under the subhead of “Depreciation and Amortization”: “The proper treatment of this charge against the income of the company presents a most difficult question, which cannot be determined with mathematical precision but must finally rest upon sound judgment, guided by such information as may be gleaned from the record. De
 
 *131
 
 preciation proper concerns the life of the plant as affected by agencies which, operating usually through a period of years, will ultimately reach a point requiring the replacement of the plant or certain parts thereof.”
 

 The substantial urovisions of Section 499-9, General Code, are as follows: “Depreciation, if any, from the new reproductive cost as of a date certain, for existing mechanical deterioration, for age, for obsolescence, for lack of utility
 
 or for any other cause.”
 

 And Section 614-49, as follows: “The charge for depreciation shall be such as will provide the amount required over and above the cost and expense of maintenance to keep the property of the public utility in a state of efficiency corresponding to the progress of the art or industry.”
 

 And Section 614-46, General Code, the section, as stated by the Public Utilities Commission, under which this case is being tried, provides that a fair price shall be fixed, with due regard “to the necessity of making reservations from the income for surplus, depreciation and contingencies.”
 

 Thereupon follows a fair and reasonably liberal statement as to the application of the law of depreciation. Then the subject of amortization is treated separately.
 

 It would seem from the treatment of this subject that the Public Utilities Commission felt, from the statutes quoted, that it had been vested with some degree of discretionary power to make an allowance for amortization, as it in so many words admits there is no statutory authority covering the item of amortization. The word “depletion” is used and an attempt is made to justify amortization as a species of depreciation.
 

 Notwithstanding the commission treats amortization and depreciation conjointly and separately, the gas company claims that in addition to all allowances made
 
 *132
 
 the commission should have allowed amortization sufficient to return the entire investment of the company to the stockholders during the period of the life of the business.
 

 The Public Utilities Commission, as we take it, has no vestige of discretion in evaluating the property of a public utility. Section 499-9, General Code, does contain language that would seem to delegate a discretionary power to the commission, as follows: “Depreciation, if any, * * * for existing mechanical deterioration, for age, for obsolescence, for lack of utility
 
 or for any other cause”
 
 Paragraph E.
 

 The words “or for any other cause” at first blush open a wide vista, but when we apply the limitation “existing mechanical deterioration” it gives a far different meaning. Each of these words is limited by the other in inverse order. The subject being dealt with is “deterioration.” What kind of deterioration? Mechanical deterioration. When? Now, existing mechanical deterioration.
 

 Section 614-49, General Code, is to the effect that the commission shall not be parsimonious in making its allowance for depreciation, but that it shall allow enough “over and above the cost and expense of maintenance to keep the property of the public utility in a state of efficiency corresponding to the progress of the art or industry.” This section delegates no discretionary power.
 

 Section 614-46 provides that in fixing a rate, price, charge, toll or rental, due regard shall be had to the necessity of making reservations from the income for surplus, depreciation and contingencies. This section simply furnishes some side lights by which the commission must be guided in dealing with public utilities. It employs no language suggestive of a delegation of discretionary power, hence we must hold that the Public Utilities Commission of Ohio has no discretionary power in “ascertaining the value of the various kinds
 
 *133
 
 and classes of property of each public utility,” but it must keep within the bounds prescribed by Section 499-9, General Code, as liberalized by Sections 614-46 and 614-49, General Code.
 

 The Public Utilities Commission further states:
 

 “The Ohio Fuel Company under its set-up claims an annual depreciation allowance of $1,420,241.00 and for amortization an annual allowance of $5,449,221.00, a total annual charge of $6,869,462.00. The question of depreciation as presented by each side to this controversy will be found in company’s brief, page 69, et seq., and in City’s brief, page 342, et seq. As against the claims of each party the concurring commissioners, with the assistance of the Commission’s engineers, have arrived at the conclusion that 1%% of the present value of the depreciable property, being all of the physical property, with the exception of lands and rights of way, would correctly represent the average amount that should be set aside for depreciation reserve. This amount produces $667,612.00. As to amortization we have considered the evidence disclosing that the average life of an Ohio well is seven and one-half years. The depreciation estimated from present rock pressure of each well discloses that there is at this time a depreciation of 58.1126%, leaving the present value of these items of 41.8874% of the original value of the leaseholds.
 

 “Considering the present condition of these wells the remaining life expectancy is an average of three years and two months. We have considered that accounts 211, gas well construction, and .212, gas well equipment and leaseholds, are all subject to the proper amortization for the reasons already set forth. Considering the present value of the three items in reference to the remaining life expectancy we find that the annual amortization should be $4,158,954.00. The two items of depreciation and amortization amount annually to $4,826,566.00.
 

 
 *134
 
 “These allowances should be devoted to the purposes of depreciation and amortization alone and if necessary to be invested they should be invested in compliance with the statute and must not be devoted to any other purpose or used for paying dividends. If they are so conserved and used they will afford a fund from which the company may from time to time draw funds sufficient to keep the plant in effective operation. If the funds should be appropriated to other purposes, the time might well arrive when the company may not. have available, and may not be able to obtain the necessary capital to restore depleted property.”
 

 This would be good law, if it were the law. But we just cannot read amortization into the law of Ohio. The Legislature had its reason for not making a provision for amortization in the legislative formula provided for evaluating the properties of public utilities. How can an allowance for new production and amortization be reconciled? How can you spread amortization over the uncertain life of a natural gas company? The commission undertakes to spread it over the life of producing wells. If amortization were permissible under the statute, this rule could not be indulged.
 

 . The commission holds that life expectancy of the gas company’s producing wells is three years and two months, and on this basis there should be an annual amortization of $4,158,954. With this finding of the commission this court cannot agree.
 

 As indicated in the discussion above, the application of the principles laid down would result in a valuation even less in material parts than that arrived at by the minority of the commission. It follows that the court holds that the rate established by the ordinance in question is neither unreasonable, unlawful, nor confiscatory.
 

 These conclusions necessitate a reversal of the order of the commission both in error proceeding No. 23868, in which the city of Columbus, Ohio, prayed that the
 
 *135
 
 finding and order of the commission be reversed or vacated, and in error proceeding No. 23864, instituted by the utility, praying that the order of the commission be vacated. In case No. 23867 the city of Columbus had filed a separate error proceeding, praying in substance that the commission might be directed and ordered first to find and file tentative valuations of the properties involved in the case and to proceed in respect thereto in accordance with the statutes governing such tentative valuations.
 

 The objection presented in this petition in error is that the commission irregularly and unlawfully made its findings and fixed the rate without having first fixed, filed and announced tentative valuations of the properties to which any interested party might file objections or protests, in violation of Section 499-12, General Code, and other sections of the statutes applicable thereto.
 

 Since we have reversed the order of the commission, this petition in error in case No. 23867 now presents a question which has become moot, and therefore without ruling upon the question therein presented, error proceeding No. 23867 will be dismissed.
 

 Order reversed in causes Nos. 23864 and 23868.
 

 Petition in error dismissed in cause No. 23867.
 

 Weygandt, C. J., Day, Allen, Stephenson and Matthias, JJ., concur.
 

 Bevis, J., not participating.