By the Court.
 

 It is contended by counsel for the city of Cleveland that Section 614-46, General Code, as applied to the facts of this case, and the action of the commission thereunder are unconstitutional.
 

 Constitutionality of Appeal Statutes.
 

 Counsel for the gas company urge that a consideration of the constitutional question^ presented in the brief of the city is precluded by reason of the fact that such questions were not raised before the commission and are not referred to or stated in the application for rehearing before the commission. In support of that position, Section 543, General Code, is relied upon. That section provides for the filing of an application for rehearing and requires that the application * ‘ shall set forth specifically the ground or grounds on which the applicant considers said decision or order to be unreasonable or unlawful.” Supporting cases cited are
 
 City of Tiffin
 
 v.
 
 Public Utilities Commission,
 
 110 Ohio St., 659, 145 N. E., 32;
 
 Travis
 
 v.
 
 Public Utilities Commission,
 
 123 Ohio St., 355, 175 N. E., 586; and
 
 City of
 
 
 *238
 

 Dover
 
 v.
 
 Public Utilities Commission,
 
 126 Ohio St., 438, 185 N. E., 833.
 

 In the first of these eases, it appears that no application for rehearing had ever been filed, and in the last case, the application for rehearing had not been filed within the required time. It is stated in the syllabus in the
 
 Travis case
 
 that “the filing of an application for rehearing befQre the Public Utilities Commission is a jurisdictional prerequisite to an error proceeding from the order of the commission to this court, and only such matters as are set forth in such application can be urged or relied upon in an error proceeding in this court.”
 

 The specific question here presented is referred to only in the
 
 Travis case.
 
 It there appears that Krumm, a trustee, who, as such, was the owner and holder of bonds of the utility company involved, filed his petition in this court under claim or right as presenting a debatable constitutional question, in which he sought review of the same order complained of by other parties in other cases which were jointly presented. Having reference to the contention made by counsel for Krumm that the record presented a question arising under the Constitution and that therefore he could file his petition in error as of right, it is stated in the opinion that “this question need not be decided, because, if a constitutional question be conceded, the proceeding must be filed within the time limited for prosecuting error from the commission.”
 

 In the instant case, the application for rehearing was filed and the appeal taken within the required time. It seems quite obvious that the requirement of the filing of an application for rehearing contemplates the enumeration only of the grounds which the Public Utilities Commission would be authorized to consider and determine. It was the manifest duty of the commission to proceed under and in accordance with the terms and provisions of the statute with the assumption of its
 
 *239
 
 constitutionality. Constitutionality of statutes is a question for the courts and not for a hoard or commission.
 

 The provisions of Section 4, Article XVIII, of the state Constitution, confer authority upon municipalities to contract with a public utility for its product or service. Such contracts are entered into by the passage of an ordinance fixing the rate and terms for such product and service for a specified period and the filing of a written acceptance thereof by the company. A contract so entered into is binding upon both parties and is not subject to review by the Public Utilities Commission.
 
 Link
 
 v.
 
 Public Utilities Commission,
 
 102 Ohio St., 336, 131 N. E., 796;
 
 City of Akron
 
 v.
 
 Public Utilities Commission,
 
 126 Ohio St., 333, 185 N. E., 415;
 
 City of Cleveland
 
 v.
 
 Cleveland City Ry. Co.,
 
 194 U. S., 517, 48 L. Ed., 1102, 24 S. Ct., 756;
 
 Columbus Ry., Power & Light Co.
 
 v.
 
 City of Columbus,
 
 249 U. S., 399, 63 L. Ed., 669, 39 S. Ct., 349.
 

 It does not appear, however, in this instance that there is any existing contract between the city of Cleveland and the utility fixing the rate and terms for product or service. In the absence of such contract, the Public Utilities Commission is authorized by Section 614-46, General Code, upon hearing upon appeal to fix and determine the just and reasonable rate and order the same substituted for the rate fixed by the ordinance, or it may find and declare the rate so fixed by the ordinance to be just and reasonable and ratify and confirm the same. Section 614-45, General Code, permits the utility to collect the former rate until the commission passes on its validity, and the commission is authorized not merely to fix the rate for the remainder of the ordinance period but to substitute a new rate for the entire period covered by the ordinance. We are unable to see anything in the statutes or in their application by the utilities commission violative of the home
 
 *240
 
 rule provision authorizing a contract between the parties.
 

 An appeal to the Public Utilities Commission is provided for when the ordinance rate is not accepted, as was the case here. The effect of such appeal is clearly-stated in the statutory provisions which have been discussed and applied in numerous cases. Service is to be continued, but the rate therefor will be such as is finally determined by the commission, subject, of course, to review by this court. Pending hearing and final determination, the immediately previous effective rate may be charged if the.utility enters into an undertaking as prescribed by statute. Such appeal does not constitute a waiver of the right to charge and collect such rate as may be finally established as the fair and reasonable rate.
 
 City of Cleveland
 
 v.
 
 Public Utilities Commission,
 
 126 Ohio St., 91, 183 N. E., 924.
 

 Delay Rentals.
 

 Another controversy between the city of Cleveland and The East Ohio Gas Company grows out of the question as to whether the cost of canceled and abandoned leaseholds, held for a period of time before abandonment to determine whether they could be made productive, should be treated as a part of the cost of the used and useful leaseholds retained by the company and operated by it in the production of gas, and should be included in the rate base.
 

 The city conceded that the nominal cost of acquisition of leases, which were drilled, found to be productive and transferred to operated leaseholds, and the cost of delay rentals paid on these particular leases while unoperated during exploration up to the time they were drilled and found productive, with interest on these costs, may be properly carried into the rate base.
 

 The company, on the other hand, claims that not only these items should be included in the cost of operated leases, but that the nominal cost of the acquisition of
 
 *241
 
 unoperated leases canceled in the process of exploration in the average amount of 52 acres unoperated leases canceled to one acre found to he productive, and the delay rentals paid during the exploration period on these average 52 acres canceled to one acre operated leases developed, together with interest on these items, should also he charged in the rate base as a part of the actual cost of the presently operated used and useful leaseholds now in production.
 

 There is no disagreement that delay rentals paid on unoperated but retained leases, as distinguished from abandoned and canceled leases, are not and should not be capitalized until these leases are operated, but these rentals are charged to operating expense in accordance with the commission’s requirements as to accounting. All agree that such rentals should not be allowed and were not allowed as a current expense for rate-making purposes.
 

 Evidence admitted shows that in the 32 years (1906-1937), the company acquired and sorted about 2,500,-000 acres out of which it found, approximately 48,060 acres of productive leases of which, in 1937, it operated 27,724 acres; that it canceled and abandoned 52 acres for each productive acre retained. Therefore, the company claims that the cost of its 48,060 operated acres drilled between 1906 and 1937 includes the cost of acquiring and canceling leaseholds covering 2,486,627 acres, together with the delay rentals paid thereon during the same years; that since only 27,724 acres of the 48,060 operated leaseholds acres, which the company had drilled in its history, were still operated in 1937, a proportional part of the total delay rentals paid and cost of acquisition of the leaseholds abandoned, in the ratio that the present company
 
 drilled
 
 operated acreage bears to the
 
 total
 
 company operated acreage, should be capitalized as a part of the rate base.
 

 In addition to the 27,724 acres of operated leaseholds developed by the company itself, the record
 
 *242
 
 shows that it operated 4,031 acres which it purchased already developed. The company claims that in this purchase from the owner there was included the entire cost of the operations of the owner in finding these productive acres, corresponding to the cost of abandoned leases and delayed rentals thereon in developing its own operated acres.
 

 For the purpose of showing that the^cost of its developed leaseholds was reasonable, testimony was offered, received and undisputed to the effect that its 4,031 operated acres so purchased were estimated as having 6,686,000,000 cubic feet remaining reserves valued at $713,242 or $177 per acre, or 10% cents per M c. f. of remaining reserves, or a cost of 3% cents per M c. f. more than the cost of gas from operated acres which the company itself had developed under leases.
 

 The commission adopted substantially the view of the company on the subject of the cost of gas developed under leases and in its finding said:
 

 “The company presented evidence showing that to acquire and develop these leases it actually spent, exclusive of expenditures on wells that proved nonproductive, in excess of $6,000,000, or approximately $220 per acre. It reduced this development cost by the amount of exhaustion on these leases to the date certain, showing a remaining development cost of slightly less than $2,000,000, or $71.31 per acre on the average. This is equivalent to about 7 cents per 'M c. f. of remaining reserves.
 

 “These development costs necessarily include the sums spent by the company in acquiring, carrying and canceling unoperated acres which eventually proved nonproductive but which the company had to acquire, test and cancel in order to locate the productive acres in service on the date certain. They do not include expenditures for current delay rentals since these are a part of the cost of the development of future operated leases not presently used. This evidence on the part
 
 *243
 
 of the company was in nowise challenged and showed that the cost of developing its own gas supply by the methods it did use was substantially less per acre and per M c. f. of reserves than the cost of its purchased gas supply.
 

 “Upon consideration of all the evidence we fix the present value of the company’s 27,724 acres of developed leases at an average of $70 per acre, or a total of $1,940,680 as of June 30, 1937. This finding places in the rate base for acres developed by the company a little less than 7 cents per M c. f. as compared with 10% cents per M c. f. of reserves for acres purchased by the company as operated, and as against 9.6 cents per M c. f. which the city recommended to be included for the value of the leaseholds purchased by the company as operated.”
 

 The city claims that the commission erred in its finding on this subject and argues that this court, in the case of
 
 East Ohio Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 133 Ohio St., 212, 12 N. E. (2d), 765, held that a depletion allowance could not include the cost of acquiring and carrying presently unoperated acres, and,
 
 a fortiori,
 
 could not include the cost of unoperated acreage abandoned or canceled.
 

 However, the Supreme Court of the United States in the case of
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 398, 78 L. Ed., 1327, 54 S. Ct., 763, reversing this court (127 Ohio St., 109, 187 N. E., 7) indicates that in giving effect to the terms of the Ohio statute as providing a method of fixing the price for a utility product through a determination of the value of its property used and useful in the operation, a strict construction cannot be applied to a utility such as a gas company which suffers wasting assets.
 

 Mr. Justice Cardozo, speaking for the court in that case, said:
 

 “We have seen in the
 
 Dayton case
 
 that * * * the commission included among the operating expenses * * *
 
 *244
 
 an annual allowance of $4,158,954, to amortize the value of leaseholds ***(*** then in use) and of the well-structures and equipment used in connection therewith, and thus provide a fund that would restore the depleted capital when the gas had been exhausted. The same allowance was made here.
 

 “Upon the appeal by the city of Columbus to the Supreme Court of Ohio the item thus allowed was excluded altogether. The court did not deny that without the creation of a fund to replenish wasting assets the affiliated seller would be left with only a salvage value for leases, well and fittings after the exhaustion of the gas. It put its judgment upon the ground that the statute of Ohio defining the powers of the commission and the method of appraisal makes no provision for depletion (Ohio General Code, Sections 499-9 to 499-13), and that the statute, and nothing else, gives the applicable rule. We may assume in submission to the holding of that court that the amortization allowance must be rejected if the rate making process is to conform to the rule prescribed by statute, irrespective of any other. That assumption being made, the conclusion does not follow that the statutory procedure may set at naught restrictions imposed upon the states and upon all their governmental organs by the Constitution of the nation.
 

 “To withhold from a public utility the privilege of including a depletion allowance among its operating expenses, while confining it to a return of 6% per cent upon the value of its wasting assets, is to take its property away from it without due process of law, at least where the waste is inevitable and rapid, * * *. Plainly the state must either surrender the power to limit the return or else concede to the business a compensating privilege to preserve its capital intact. * * * It is idle to argue that a company using up its capital in the operations of the year will have received the
 
 *245
 
 same return as one that at the end of the year has its capital intact and interest besides.
 

 “We hold that a fair price for gas delivered at the gateway includes a reasonable allowance for the depletion of the operated gas fields and the concomitant depreciation of the wells and their equipment. What that allowance shall be has not yet been considered by the Supreme Court of Ohio, invested with jurisdiction to review the law and facts. *
 
 * *
 
 There will be power, we assume, to direct another hearing if the basis for an intelligent judgment is lacking in the record. When the allowance has been fixed and has been charged to operating expenses, it will supply the answer to other questions in controversy now. There will be no need, when that is done, to include in operating expenses a separate provision for the payment of ‘ delay rentals ’ upon leases in reserve. * * * ”
 

 In view of the above discussion by the Supreme Court of the United States, what is meant by an allowance for wasting assets? Primarily, it undoubtedly refers to an amortization of the decrease of gas reserves under a leasehold as the gas is removed. But all leaseholds taken by the company in good faith with the reasonable expectation that gas may be found underneath them, represent a cost to the company, and are, while held by the company, assets of the company. When some of such leaseholds must be abandoned because upon test it is found that they will not produce gas, there is a dimunition or wasting of assets in the process which cannot well be differentiated from the diminution or wasting of assets on other productive leaseholds by the gradual removal of the gas reserves underneath them. In both cases, the leaseholds eventually become worthless and must be abandoned, and when so abandoned the company has suffered a waste of assets to the extent of the money invested in them.
 

 The cost of the unproductive abandoned leaseholds, including delay rentals while they were held by the
 
 *246
 
 company, must be charged back as a loss and represents a wasted or wasting asset.
 

 It must be apparent that the cost of acquiring, holding for a time during which delay rentals must be paid, testing and finally canceling unproductive acres is the only method by which productive gas acres can be found and developed, and it is equally apparent that this expense must be borne by the consumer who ultimately uses the gas from the productive acres.
 

 We think the commission, in taking this position and in making its finding accordingly, was fully justified under the law.
 

 Gas Purchased from Affiliate.
 

 Another complaint of the city of Cleveland is that “the commission erred in making an excessive allowance for gas purchased from the affiliated [The] Hope Natural Gas Company and in failing to find that the company has not sustained the burden of proving an allowance for payments to Hope in excess of 30 cents per thousand cubic feet at the Ohio river.”
 

 The aggravating cause of the unending and understandable strife on this point is the complicating fact that The East Ohio Gas Company and The Hope Natural Gas Company are affiliated corporations, both being owned by the Standard Oil Company of New Jersey. This is the third time in six years that this price has been litigated.
 

 Prom the welter of figures in the record and briefs it appears that this contract price averaged 36.15 cents during the year ending June 30, 1937. During the following year the average was 36.82 cents per M c. f.
 

 The East Ohio Gas Company purchases approximately 70 per cent of its gas from the Hope company whose producing fields are mainly in the northern part of West Virginia. About 15 years ago this supply, was found to be inadequate. To meet this difficulty the company extended its pipe-line system over one hundred miles to the southern part of West Virginia
 
 *247
 
 at a cost of more than $6,000,000. It also entered into long-term contracts with a number of producers for a supply of gas. There is no evidence to indicate that these transactions were not conducted in good faith in order to meet the fluctuating seasonal demands.
 

 While the price allowed by the commission is liberal, this court would not be justified in holding it excessive.
 

 General Overheads.
 

 The commission’s finding with respect to general overheads reads as follows:
 

 “General Overheads. General overheads are a matter of proper estimate.
 
 Ohio Utilities Co.
 
 v.
 
 Public Utilities Commission,
 
 267 U. S., 359 (1925) [69 L. Ed., 656, 45 S. Ct., 259]. The general overheads set forth in Table 1 are based upon the percentages agreed to between the parties in the former Cleveland case (E. O. X. 19, pp. 19-20), agreed to between the company and the present city experts in the
 
 Akron case
 
 (E. O. X. 3, p. 9, 17, P. U. R. [N. S.], 433 p. 440), used by the company, commission and city engineers throughout their reports and valuations made in connection with this case and testified to by Mr. Ehodes as less than are actually encountered in the construction of large natural gas properties * *
 

 The total general overhead allowed is 16 per cent of the estimated reproduction cost new, broken down as follows: Interest during construction — 7 per cent; preliminary organization expense — 0.5 per cent; taxes during construction — 2 per cent; engineering and superintendence during construction — 4.5 per cent; and administrative and legal expense during construction —2 per cent.
 

 The city of Cleveland does not contest the items but merely the percentages allowed.
 

 The city’s contention is that the allowance was excessive because made on the basis of theory and not on the basis of the actual experience of the company, and
 
 *248
 
 that the finding was therefore arbitrary and unreasonable.
 

 The record discloses that the city of Cleveland and The East Ohio Gas Company had agreed upon a schedule of general overhead allowances for 1931, which schedule was again used in the instant case. The city of Cleveland contends that it was error to use this schedule as of June 30, 1937, because economic conditions have changed since 1931, and figures which were then applicable are no longer reasonable when applied to the year 1937. It must be noted, however, that the record fails to disclose any evidence submitted by the city showing, or tending to show, what figures would be applicable and reasonable for the year 1937. It was only after all the evidence had been introduced into the record that the city, through its counsel, for the first time raised the question in argument.
 

 The proceeding is here for review on the record, and to the record we are obliged to confine ourselves. The city contends that the figures which the commission used and adopted are conjectural. Yet the record contains no evidence adduced by the city showing what figures are not conjectural. On the other hand, there is a substantial basis in the evidence contained in the record for the commission’s estimate that the general overheads would amount to 16 per cent as above set forth. Thus, there is in evidence an agreement between the company and the city, entered into in 1933, stipulating that 16 per cent should be the allowance for general overhead. in 1931. There is also in evidence a report, bearing date of January, 1936, from the city engineers to the city council, which contains the same general overhead figures. On December 17,1936, a city engineer and a gas company engineer made a joint report to the city council in which all general overheads were computed in accordance with the 1931 schedule of general overheads. The work-sheets of the city engineer, made in connection with the report he submitted
 
 *249
 
 to the city council on April 1, 1937, show that he used the same schedule of general overheads. It is thus seen that the 1931 schedule of general overhead estimates was used as a basis by the city engineers, relied upon by them and never questioned, and that the city introduced no evidence in derogation thereof. The attack against the 1931 schedule came not in the form of evidence introduced into the record by witnesses competent to express expert opinions, but it came by argument of counsel after the evidence was all introduced. The function of argument is to interpret and not to replace evidence. Whether it was right or wrong for the commission to use the 1931 estimate as a basis must be judged by the evidence alone. Yet we find no evidence in the record which disputes the correctness of the 1931 estimate which the commission used as a basis for its allowance in this case. There is no testimony in the record adduced by the city engineers that the 1931 estimate, as applied to 1937, is excessive, or that it would be unfair to apply it. In view of the state of the record, acceptance of the 1931 estimate of the general overhead for 1937 was not arbitrary, but, on the contrary, its rejection would have been arbitrary. Its acceptance was based on evidence which was not contradicted or in any way challenged by competent evidence of the city. Being supported by substantial evidence, the finding of the commission cannot be said to be arbitrary.
 

 With respect to the question of reasonableness, suffice it to say that the commission is protected by the presumption that its findings and orders are just and reasonable.
 

 With respect to the city’s contention that the 16 per cent allowance was excessive because the company offered no evidence that such an amount had been actually expended in the construction of its property, or that it would necessarily be expended in reproducing the property, suffice it to say that the amount to be allowed for general overhead charges does not depend
 
 *250
 
 upon proof of actual expenditures originally made, but depends upon estimate.
 
 Ohio Utilities Co.
 
 v.
 
 Public Utilities Commission,
 
 267 U. S., 359, 69 L. Ed., 656, 45 S. Ct., 259.
 

 Among the percentages contested is tbe rate of interest allowed, tbe city arguing that 7 per cent is too high. While this court will take judicial notice of a decline in the general interest rate, it will not take judicial notice of the amount of the decline. There is no evidence in the record, either of the fact -of decline or of the amount. The only evidence in the record bears upon the rate of interest on call money and hence is not here applicable.
 

 Leakage and Unaccounted for Gas.
 

 The city challenges the allowance of 4,000,000,000 cubic feet per annum fixed by the commission for leakage and unaccounted for gas in the Hope system and contends that a fair and reasonable allowance would be 1,000,000,000 cubic feet which was the amount fixed by the commission in the former
 
 Cleveland
 
 and
 
 Alerón cases.
 
 The commission in its findings asserts that the record contains “substantial additional factual evidence” supporting the present allowance.
 

 The East Ohio Gas Company measures all but a small fraction of its gas whether produced by itself or purchased from others. On the other hand Hope measures the gas it buys from others but does not meter all the gas produced from its own wells; consequently it is impossible to determine with absolute accuracy Hope’s leakage and unaccounted for gas, and methods of computation must be resorted to.
 

 The city’s contention is grounded mainly upon the testimony of A. P. Learned, an expert. Basing his computation upon the leakage experience of The East ^hio Gas Company, he fixed the leakage and unaccounted for gas of Hope at 100,000 cubic feet per mile per,year or 1,000,000,000 cubic feet per year for the whole system.
 

 
 *251
 
 The company’s expert, George I. Rhodes, recites facts which tend to show that Learned’s conclusions are wrong and inaccurate even if The East Ohio Gas Company’s experience is used as the basis for calculation. Rhodes also advanced what he claims is a more accurate formula. He took Hope’s books and from them found the ratio of metered to calculated production. By applying this ratio to the average annual calculated production from all wells he found the average fl.nmml equivalent metered production from all wells. From the amount obtained he subtracted the average annual accounted for production. The result was 4,779,-000,000 cubic feet which he found to be the everage annual unaccounted for gas from purchases and production.
 

 To prove the accuracy of his formula, Rhodes took the experience of other West Virginia companies as found in reports made by them to the West Virginia Public Service Commission and showed that their line loss per mile exceeded that of Hope as he estimated it.
 

 The commission was warranted in fixing 4,000,000,-000 cubic feet per annum (which is an amount less than Rhodes’ estimate) by expert testimony and “substantial additional factual evidence.” The finding in this behalf is not unreasonable, unlawful or against the manifest weight of the evidence.
 

 Rate of Return.
 

 The East Ohio Gas Company contends that the commission erred in allowing a rate of return of only 6% per cent, whereas the commission should have allowed, and erred in failing to allow, a return of a least 7% per cent. The company contends also that the commission erred in fixing a rate of return of only 6% per cent as reasonable for The Hope Natural Gas Company, whereas a rate of return of at least 8 per cent would be reasonable.
 

 On the other hand the city claims the commission erred in finding that a return of 5% per cent “would
 
 *252
 
 be not only unfair and. unreasonable but border on the line of confiscation,” and in failing and refusing to find and conclude as requested by the city that even a 5 per cent return on the present fair value would be nonconfiscatory.
 

 The commission in its finding upon a fair rate of return for the period between June 30, 1937, and July 1, 1939, relied upon the case of
 
 East Ohio Gas Co.
 
 v.
 
 Public Utilities
 
 Commission, 133 Ohio St., 21, 12 N. E. (2d), 765, which involved fixing the rates in Akron for a four-year period from May 19,1933, to May 19,1937. In the Akron proceeding the company insisted upon a return of 7% to 8 per cent and the city, a rate of 6 per cent as adequate. In the present case the commission recognized its duty of establishing a rate which would be higher than the line of confiscation and quoted the following from page 229 of the opinion of this court in the
 
 Akron case:
 

 “A
 
 return of 6% per cent on the valuation was allowed by the commission, which is similar to that allowed in other cases before this court for approximately the same period. A rate of return may vary as to times depending on business conditions, but it must be one that shall be reasonably sufficient to assure confidence in the financial soundness of the utility.
 
 Bluefield Water Works
 
 v.
 
 Public Service Commission,
 
 262 U. S., 679, 692, 693, 67 L. Ed., 1176, 43 S. Ct., 675.”
 

 On the same page of the opinion Judge Gorman said that “a rate of return of 6% per cent during the early years of the [Alerón] ordinance would be high, but during the latter years was fair and reasonable. It is not a rate that could be said to be confiscatory.”
 

 The commission stated in the present rate-making proceeding: .
 

 “The record in this case discloses a substantial improvement in 'business conditions and resultant corporate earnings over the average prevailing during the period of the Akron ordinance and over the 1931-36
 
 *253
 
 period of the Cleveland ordinance involved in the former Cleveland case, * * * and in onr opinion a rate of return of but 5% per cent as suggested by the city would be not only unfair and unreasonable but border on the line of confiscation, while on the other hand we are not satisfied that conditions warrant a rate of return of 7% per cent as claimed by the company.”
 

 The conclusions of the commission as to the rate of return are supported by the record and a rate of 6% per cent is sufficient to assure confidence in the financial soundness of the gas companies, is not confiscatory and is not unfair or unreasonable as between the public and the utilities.
 

 Practice and Procedure.
 

 The city of Cleveland, contends there were errors in practice and procedure committed by the commission of such a material nature as to require a reversal and a remand of the cause.
 

 These alleged errors relate to the refusal to grant a stay of the proceedings until the Federal Power Commission had acted on the city’s application for an investigation of the rate charged by The Hope Natural Gas Company to The East Ohio Gas Company at the Ohio river; denying the city an opportunity to inspect full pipe lengths of transmission lines; failing to require The East Ohio Gas Company to produce available evidence of the original cost of its properties; and failing to require the gas company to produce relevant and material evidence on other controlling matters, including the river rate.
 

 As to the first complaint, the commission had before it a rate ordinance of only two years’ duration, expiring July 1, 1939, and had to move with celerity in the main objective of fixing the fair and reasonable rate which the consumers should pay for their gas as it came from the burner tips on their premises. And in so doing it was the duty of the commission to fix a rate in Cleveland as of June 30, 1937. Any river rate
 
 *254
 
 the Federal Power Commission might designate would he of an entirely prospective nature and would consequently he of no benefit or controlling force in the present proceedings.
 

 It was found by the commission that the principal purpose of the city in demanding the right to inspect the pipes comprising the transmission lines was to reassert its theory that an accrued depreciation should be based on the deepest pit in a 20-foot length of pipe. This method for determining accrued depreciation had been rejected by the commission in at least two previous cases, as unsound and impractical, and' the commission adopted a formula or test to determine this element, which was denoted as fair and adequate in the case of
 
 East Ohio Gas Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 known as the
 
 Akron case.
 

 As to the claimed error on the part of the commission in not requiring The East Ohio Gras Company to produce a statement of the original cost of its properties, it was testified by the company accountants that such cost did not appear upon the company books with any completeness, was not readily ascertainable from any other source and, if it could be obtained, would not prove definite or satisfactory in determining the fact for which it was desired.
 

 The city did not offer evidence to disprove these statements nor did it avail itself of the opportunity to examine the company’s books to determine any such costs. Besides, in Ohio, there is no statute requiring the commission to consider evidence of original cost in fixing a fair and reasonable rate if such rate can be determined on other reliable bases.
 

 Concerning the complaint that the commission erred in not ordering the company to produce other evidence, the commission determined, under the circumstances, that the company was not obligated to do so. However, the company’s records were made available to the city, its engineers and accountants, so that the in
 
 *255
 
 formation could be ascertained and presented by tbe city if it deemed tbe same of importance in the proceeding.
 

 A careful examination of the claimed errors in connection with practice and procedure fails to show anything of sufficient gravity to warrant a reversal.
 

 For the reasons stated the orders of the commission are not unlawful or unreasonable and they are therefore affirmed.
 

 Orders affirmed.
 

 Weygandt, C. J., Day, Zimmerman, "Williams, Matthias and Hart, JJ., concur.