[S.F. No. 23217. Nov. 23, 1976.]

SOUTHERN PACIFIC TRANSPORTATION
COMPANY, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent.

**Counsel**

Harold S. Lentz for Petitioner.

William M. Siegel, County Counsel (Santa Clara), Gerald J. Thompson, Assistant County Counsel, Peter G. Stone, City Attorney (San Jose), Richard K. Karren, Assistant City Attorney, Donald C. Atkinson and William B. Mayfield, Deputy City Attorneys, as Amici Curiae on behalf of Petitioner.

Richard D. Gravelle, J. Calvin Simpson and John S. Fick for Respondent.

**Opinion**

**CLARK, J.**—Southern Pacific Transportation Company seeks review of Decisions 83509 and 82933 of the Public Utilities Commission, holding that Public Utilities Code section 1202.3 is unconstitutional.[1]

Following an auto-train collision at a crossing on Southern Pacific Coast Route Main Line, the Public Utilities Commission (commission) investigated the safety, maintenance, operation and use of the crossing.

The commission found that public welfare, convenience and necessity require the crossing be protected by flashing light signals and automatic

---

[1]Unless otherwise specified, all statutory references are to the Public Utilities Code.

gate arms. It also found the crossing is "publicly used" within the meaning of section 1202. ▮▮ ▮▮▮▮ However, concluding that section 1202.3 is unconstitutional,[2] the commission ordered the costs of installing and maintaining the protective devices be paid by the railroad, the City of San Jose, County of Santa Clara, and the Department of Transportation.

Section 7537 gives the owner of adjoining lands the right to *private* or *farm* crossings necessary or convenient for egress or ingress. The railroad

[2]In adopting its rules and regulations, an administrative agency must act within the Constitution. (*Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 256 .[53 Cal.Rptr. 673, 418 P.2d 265].) Due process provides "the best insurance for the government itself against those blunders which leave lasting stains on a system of justice." (*Id.*, at p. 255.) An administrative agency's obligation to adhere to the Constitution is not limited to mere promulgation of rules, but extends to the agency's application of legislation to the facts presented. (E.g., 3 Davis, Administrative Law Treatise (1958) § 20.04, p. 74; Jaffe, Judicial Control of Administrative Action (1965) pp. 438-439.) Obviously, administrative agencies, like police officers (*People* v. *Cahan* (1955) 44 Cal.2d 434, 437 [282 P.2d 905, 50 A.L.R.2d 513] [former Pen. Code, § 653h "could" not authorize violations of the Constitution]), must obey the Constitution and may not deprive persons of constitutional rights.

In a few cases involving the question whether a litigant may raise constitutional issues in court when he has not exhausted administrative remedies, it has been indicated that administrative agencies may not determine the validity of statutes, invalidating the legislative will. (3 Davis, Administrative Law Treatise, *supra*, § 20.04, p. 74.) The exhaustion question, of course, involves a number of considerations other than whether a statute excuses an administrator from his constitutional duties.

Taken literally, the two lines of authority are difficult to reconcile. When the United States Supreme Court, for example, repudiates the separate but equal doctrine established by the statutes of one state, should the school boards of other states continue to apply identical statutes until a court declares them invalid; should the boards, recognizing the potential denial of constitutional rights, enforce the Constitution on a case-by-case basis without considering whether the statutes may be enforced in some other case; or should the boards recognize the invalidity of the statutes? The first position will result in denial of constitutional rights; the second, although protecting constitutional rights, is wasteful, ignores reality and compels intellectual dishonesty insofar as the administrator must close his eyes to the fact that deprivation of constitutional rights will occur in all cases to which the statute may be applied. Only the third complies with the board's duty to determine and follow the law.

In any event, the Constitution and statutes of this state grant the commission wide administrative, legislative and judicial powers. (Cal. Const., art. XII, §§ 1-9; Pub. Util. Code, § 701; *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 630-633 [268 P.2d 723]; *Southern Calif. Edison Co.* v. *Railroad Com.* (1936) 6 Cal.2d 737, 748-749 [59 P.2d 808].) The Legislature has limited the judiciary from interfering with the commission by restricting review to the Supreme Court and by additionally restricting review to determining "whether the commission has regularly pursued its authority, *including* a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State." (Italics added; Pub. Util. Code, §§ 1756-1760; *Waters* v. *Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4, 6 et seq. [114 Cal.Rptr. 753, 523 P.2d 1161]; *Pacific Tel. & Tel. Co.* v. *Superior Court* (1963) 60

must maintain the crossing, and the commission is given the authority to fix and assess the cost thereof.[3]

Section 1202 gives the commission exclusive power to regulate *public* or *publicly used* road or highway crossings, including locating, maintaining, protecting, and closing them. The section further provides for allocation of costs by the commission among the railroad and public entities, including the abolition expense of the crossings.[4]

Section 1202.3, added in 1971 and the subject of this appeal, provides that, in any proceeding under section 1202 involving a *publicly used* road or highway not on a publicly maintained road system, the commission may apportion costs of improvement to the public entity if the commission finds (a) express dedication and acceptance of the road or (b) a judicial determination of implied dedication. If neither condition is found, the commission shall order the crossing abolished by physical closing. The section further provides that the railroad shall in no event be required to bear improvement costs "in excess of what it would be

Cal.2d 426, 429-430 [34 Cal.Rptr. 673, 386 P.2d 233]; *Hickey* v. *Roby* (1969) 273 Cal.App.2d 752, 763-768 [77 Cal.Rptr. 486].) Public Utilities Code section 1732 provides corporations and individuals may not raise matters in any court not presented to the commission on petition for rehearing, reflecting, when read with the judicial review sections, legislative determination that all issues must be presented to the commission. Under the broad powers granted it, the commission may determine the validity of statutes.

[3]Section 7537 provides: "The owner of any lands along or through which any railroad is constructed or maintained, may have such farm or private crossings over the railroad and railroad right of way as are reasonably necessary or convenient for ingress to or egress from such lands, or in order to connect such lands with other adjacent lands of the owner. The owner or operator of the railroad shall construct and at all times maintain such farm or private crossing in a good, safe, and passable condition. The commission shall have the authority to determine the necessity for any crossing and the place, manner, and conditions under which the crossing shall be constructed and maintained, and shall fix and assess the cost and expense thereof."

[4]Section 1202 provides: "The commission has the exclusive power: [¶] (a) To determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use, and protection of each crossing of one railroad by another railroad or street railroad, and of a street railroad by a railroad, and of each crossing of a public or publicly used road or highway by a railroad or street railroad, and of a street by a railroad or vice versa. [¶] (b) To alter, relocate, or abolish by physical closing any such crossing heretofore or hereafter established. [¶] (c) To require, where in its judgment it would be practicable, a separation of grades at any such crossing heretofore or hereafter established and to prescribe the terms upon which such separation shall be made and the proportions in which the expense of the construction, alteration, relocation, or abolition of such crossings or the separation of such grades shall be divided between the railroad or street railroad corporations affected or between such corporations and the State, county, city, or other political subdivision affected."

required to bear in connection with the improvement of a public street or highway crossing."[5]

Concluding that section 1202.3 unconstitutionally delegates the state's police power to private litigants, the commission reasoned that the statute unlawfully allows private litigants absolute discretion to require closing of crossings merely by commencing a proceeding under section 1202.

■    The Legislature may not confer upon private persons unrestricted authority to make administrative determinations. (*Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 235-237 [18 Cal.Rptr. 501, 368 P.2d 101]; *State Board* v. *Thrift-D-Lux Cleaners, Inc.* (1953) 40 Cal.2d 436, 448 [254 P.2d 29]; see 1 Davis, Administrative Law Treatise (1958) § 2.15, pp. 148-151.) However, the limitation on delegation has never been interpreted to invalidate reasonable grants of power to an administrative agency, when suitable safeguards are established by the Legislature to guide the power's use and to protect against its misuse. (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 817 [114 Cal.Rptr. 577, 523 P.2d 617]; *Kugler* v. *Yokum* (1968) 69 Cal.2d 371, 375 et seq. [71 Cal.Rptr. 687, 445 P.2d 303]; *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 365 et seq. [55 Cal.Rptr. 23, 420 P.2d 735].)

The standard of public convenience and necessity has been upheld in appropriate circumstances (*Federal Comm'n* v. *Broadcasting Co.* (1940) 309 U.S. 134, 138 [84 L.Ed. 656, 659, 60 S.Ct. 437]), and this court has repeatedly applied the standard in utility cases (e.g., *Southern Pac. Co.* v. *Public Utilities Com.* (1953) 41 Cal.2d 354, 365-367 [260 P.2d 70]).

---

[5] Section 1202.3 provides: "Notwithstanding any other provision of this chapter, in any proceeding under Section 1202, in the case of a crossing involving a publicly used road or highway not on a publicly maintained road system, the commission may apportion expense for improvements to the county in the case of unincorporated territory, city or other political subdivision if the commission finds (a) that the owner or owners of private property served by such publicly used crossing agree to expressly dedicate and improve, and the affected public agency agrees to accept, a right-of-way or roadway over such property for a reasonable distance from such crossing as determined by the commission, or (b) that a judicial determination of implied dedication of such road or highway over the railroad right-of-way to public use, based on public user in the manner and for the time required by law, has taken place. [¶] If neither of these conditions is found to exist, the commission shall order the crossing abolished by physical closing. [¶] In no event shall a railroad be required to bear costs for the improvement of a publicly used crossing in excess of what it would be required to bear in connection with the improvement of a public street or highway crossing."

We are satisfied that implicit in section 1202.3 are suitable safeguards to guide the administrator's exercise of his power to close crossings and to guard against misuse of the power. By the introductory phrase "in any proceeding under Section 1202," the Legislature has declared that section 1202.3 is an exception to the former section and that the provisions for cost allocation and closing crossings in the latter section are only applicable when the commission would otherwise have ordered improvement of a crossing pursuant to the former section. The standard for compelling crossing improvement implicit in section 1202 is obviously public convenience and necessity, including safety concerns (see *In re Petersen* (1958) 51 Cal.2d 177, 185-186 [331 P.2d 24]; *Rescue Army* v. *Municipal Court* (1946) 28 Cal.2d 460, 471 [171 P.2d 8]), and this standard must be read into section 1202.3.

Thus, before the commission may close a crossing under section 1202.3, it must not only find public use and lack of requisite dedication, but also find that necessity and convenience preclude continued use of the crossing in its existing condition. Such findings—rather than mere commencement of a proceeding under section 1202—is the basis for closing a crossing under section 1202.3.

The function of the private litigant within the statutory framework is merely to call the commission's attention to the need for improving or closing a crossing and perhaps to urge action on the commission. When the private litigant points to facts requiring closure of the crossing, he is merely calling upon the commission to carry out the Legislature's direction. Acts of private parties prerequisite to operation of a statute containing valid standards for action do not constitute unlawful delegation. (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control, supra,* 65 Cal.2d 349, 365.) This is not a case where the Legislature has provided that private persons in their absolute discretion may veto or make inapplicable legislative standards and administrative determinations. (See 1 Davis, Administrative Law Treatise, *supra,* § 2.14, pp. 141-143.)

The commission also held invalid the provision of section 1202.3 limiting the railroad's costs for improvements for a *publicly used* crossing to those the railroad would be required to bear in connection with improvement of a *public* crossing. The commission reasoned that the provision is unconstitutionally vague because, although the commission presently has a policy for apportioning costs as to public crossings, it

might abrogate that policy and apportion improvement costs on a case-by-case basis. The plain meaning of the statute is that the railroad should pay no more for a *publicly used crossing* improvement than it would be required to pay for a *public crossing* improvement.[6] Whether determined on broad principles or on a case-by-case basis, allocation of costs for publicly used crossings shall be the same as for public crossings. There is nothing vague or unintelligible in the provision.[7]

The decisions are annulled.

Wright, C. J., McComb, J., Tobriner, J., and Richardson, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur with the result reached by the majority, but disagree with their opinion that the Public Utilities Commission (PUC) may declare a duly enacted statute unconstitutional. Absent authorization in the state charter itself, such formidable action is beyond the power of any administrative agency. Indeed, it is incongruous for the will of the people of the state, reflected by their elected legislators, to be thwarted by a governmental body which exists only to implement that will.

Case law is sparse in this area because administrative agencies are understandably reluctant to assert the power to hold statutes unconstitutional, and accordingly the question rarely is resolved in court. (Davis, Administrative Law Treatise (1958) § 20.04, p. 74, fn. 1 (hereinafter Davis).) What precedent there is, however, lends but scant support to the assertion of authority by the PUC.

In *Walker* v. *Munro* (1960) 178 Cal.App.2d 67 [2 Cal.Rptr. 737], the Court of Appeal suggested that an administrative agency may declare a

[6]The limitation on the railroad's liability for costs in section 1202.3 applies only to costs of improvement; the section does not limit potential eminent domain liability in the event the crossing is closed. (Cf. *City of Los Angeles* v. *Ricards* (1973) 10 Cal.3d 385, 388-389 [110 Cal.Rptr. 489, 515 P.2d 585]; *Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 662 [39 Cal.Rptr. 903, 394 P.2d 719].)

[7]Southern Pacific contends the commission erred in finding the crossing in question "is a publicly used one within the purview of Section 1202." Since the commission's construction of section 1202 underlying this finding may well have reflected its erroneous conclusion that section 1202.3 is unconstitutional, we believe that no purpose could be served by reviewing the challenged finding at this time. On remand the commission will be free to reconsider the challenged finding.

statute unconstitutional; but *Walker* was indirectly criticized and implicitly disapproved in *State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 250-251 [115 Cal.Rptr. 497, 524 P.2d 1281]. In the latter case, a litigant sought to challenge in court the constitutionality of the Coastal Zone Conservation Act without first exhausting its administrative remedies by raising the issue before the Coastal Zone Conservation Commission. We held that the constitutional issue was raised in a timely manner under the circumstances, noting that "since an administrative agency is not the appropriate forum in which to challenge the constitutionality of the basic statute under which it operates, there seems little reason to require a litigant to raise the constitutional issue in proceedings before the agency as a condition of raising that issue in the courts." (*Id.* at p. 251.) (See also *Flores* v. *Los Angeles Turf Club* (1961) 55 Cal.2d 736 [13 Cal.Rptr. 201, 361 P.2d 921] (ruling on the merits of a litigant's constitutional attacks on a statute, while holding that his other contentions should have been pursued through administrative channels).)[1]

The United States Supreme Court, on at least three occasions, has considered whether an administrative agency has the power to declare a statute unconstitutional. In each instance, the high court has concluded, as in *Davies Warehouse Co.* v. *Bowles* (1944) 321 U.S. 144, 153 [88 L.Ed. 635, 642, 64 S.Ct. 474], that "State statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared. Certainly no power to adjudicate constitutional issues is conferred on the Administrator." (Accord, *Johnson* v. *Robison* (1974) 415 U.S. 361, 368 [39 L.Ed.2d 389, 398, 94 S.Ct. 1160]; *California Comm'n.* v. *United States* (1958) 355 U.S. 534, 539 [2 L.Ed.2d 470, 475, 78 S.Ct. 446] (a decision involving the California Public Utilities Commission); see also *Oestereich* v. *Selective Service Bd.* (1968) 393 U.S. 233, 242 [21 L.Ed.2d 402, 408-409, 89 S.Ct. 414] (Harlan, J., concurring).) In other jurisdictions, the conclusion is virtually unanimous that administrative agencies lack the powers appropriated in this case. (*Metcalf* v. *Swank* (7th Cir. 1971) 444 F.2d 1353, 1356; *New York State Broadcasters Assn.* v. *United States* (2d Cir. 1969) 414 F.2d 990, 994; *Central Nebraska Pub. P. & I. Dist.* v. *Federal Pow. Comn.* (8th Cir. 1947) 160 F.2d 782, 783; *Todd*

---

[1]This court has had at least one opportunity to reach the issue herein directly, but has declined to do so. In Decision No. 64151, 60 P.U.C. 125, the commission concluded it had the authority to declare legislative acts unconstitutional. This court, reviewing the decision, upheld the conclusion of the PUC that the statute in question was constitutional, but did not address the issue of the commission's underlying power. (*Los Angeles Met. Transit Authority* v. *Public Util. Com.* (1963) 59 Cal.2d 863 [31 Cal.Rptr. 463, 382 P.2d 583].)

v. *Securities and Exchange Commission* (6th Cir. 1943) 137 F.2d 475, 478; *Panitz* v. *District of Columbia* (D.C.Cir. 1940) 112 F.2d 39, 41-42 [72 App.D.C. 131]; *United States* v. *Branigan* (S.D.N.Y. 1969) 299 F.Supp. 225, 235; *Reed* v. *Gardner* (C.D.Cal. 1966) 261 F.Supp. 87, 92; *Schwartz* v. *Essex County Board of Taxation* (1942) 129 N.J.L. 129 [28 A.2d 482, 484]; *East Ohio Gas Co.* v. *Public Utilities Commission* (1940) 137 Ohio St. 225 [18 Ohio Ops. 10, 28 N.E.2d 599, 606]; *State* v. *State Board of Equalizers* (1922) 84 Fla. 592 [94 So. 681, 30 A.L.R. 362]; contra, *Commonwealth* v. *Atlantic Coast Line R. Co.* (1906) 106 Va. 61 [55 S.E. 572].)[2] Professor Davis agrees: "Only the courts have authority to take action which runs counter to the expressed will of the legislative body." (Davis, at § 20.04, p. 74.)

Pitted against this impressive array of authority is the majority's cursory assertion (*ante,* p. 311, fn. 2) that because the PUC has been granted a broad range of responsibilities, some of which they classify as "judicial," it necessarily follows that the commission has the power to declare a statute unconstitutional. This rationale is bottomed on the debatable premise that any and all "judicial power" inherently entails the authority to declare a law unconstitutional. Parenthetically it can be noted that following the United States Supreme Court's landmark decision in *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137 [2 L.Ed. 60], the nation survived for 54 years before the high court again struck down a congressional enactment. (*Dred Scott* v. *Sandford* (1857) 60 U.S. (19 How.) 393 [15 L.Ed. 691]; 1 Freund, Constitutional Law (3d ed. 1967) p. 24.) Moreover, it is not uncommon for an agency to be granted some judicial or quasi-judicial powers but not others. That this commission is for some purposes deemed to be a judicial agency is not the answer to our problem, but rather a starting point in our consideration.

It cannot be denied that the commission is granted extensive powers by the Constitution. Under article XII, section 6, "The commission may fix rates, establish rules, examine records, issue subpenas, administer oaths, take testimony, punish for contempt, and prescribe a uniform system of accounts for all public utilities subject to its jurisdiction." In addition, the Legislature has plenary power, consistent with article XII, to increase the powers of the commission. (Cal. Const., art. XII, § 5.)

---

[2]In the cited cases the question generally arose in the course of deciding whether a party was precluded from raising a constitutional issue because of failure to pursue the claim before an administrative agency.

From these broad grants it can readily be understood why this court has declared that the commission appears to exercise judicial power. (See, e.g., *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 630-632 [268 P.2d 723].) The power may be classified into two categories. First, the Constitution has expressly granted some powers to the commission generally exercised only by courts, such as the power to punish for contempt. Second, the commission must act judicially in order to perform the responsibilities expressly granted to it by the Constitution and the Legislature: for example, in fixing rates for a carrier or a utility, the commission, by necessity, holds a hearing, takes testimony, and makes a decision adjudicating the rights of that party. But in either case the judicial power of the commission is derived from and circumscribed by the same source: the Constitution. An attempt to exercise judicial power in a manner neither expressly nor impliedly sanctioned by the Constitution would offend the doctrine of separation of powers as provided in article III, section 3: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

Our task then becomes to ascertain whether the exercise by an administrative agency of the exclusively judicial power to invalidate a statute is expressly or impliedly permitted by the Constitution. Clearly, there is no express authorization for such an assertion of power. Nor is it immediately apparent that such power can be inferred from other express constitutional or legislative authorizations. Certainly, the right to undertake a constitutional review is not necessary in order for this commission to satisfy its primary obligation: to regulate utilities and carriers. No reason has been suggested why the commission cannot perform its duties while adhering to legislative guidelines.

It may be argued that the constitutional review power can be inferred from the oaths commissioners must take to obey the Constitution: if a commissioner swears to obey the Constitution, according to this argument, then he cannot be expected to enforce a law believed to be unconstitutional.

The contention is twice flawed. First, every public official in the state takes a similar oath to uphold the Constitution, including notaries public, city councilmen and county supervisors. Few in those categories have

ever maintained the right to declaim on constitutionality. Second, and more fundamentally, the proposition erroneously equates the duty of a commissioner to uphold the Constitution with an asserted "duty" to declare laws with which he is unsympathetic to be unconstitutional. A commissioner faithfully upholds the Constitution by complying with the mandates of the Legislature, leaving to courts the decision whether those mandates are invalid. The oath of office to obey the Constitution requires obedience to the Constitution not as self-indulgently defined by the commission, but as interpreted by objective judicial tribunals. (See *Barr* v. *Watts* (Fla. 1953) 70 So.2d 347, 351.)

A related contention is that the commission, within its jurisdiction, must decide cases, and in order to do so must interpret all applicable law. If two statutes seemingly conflict on a point, the commission, consistent with statutory interpretation guidelines, must decide which to apply. Similarly, when a statute conflicts with the Constitution the commission must apply the latter.

Although this contention is superficially plausible, on closer examination it is no more than a variation of the majority's rationale that because the commission exercises certain judicial powers it necessarily has the right to declare a law unconstitutional. Certainly, in order to decide individual cases the commission must apply relevant law. But it by no means follows that applying "relevant law" includes declaring statutes unconstitutional. To the contrary, the implication is that cases are to be decided simply by applying statutory law, with questions of unconstitutionality to be resolved by the courts.

In short, it appears that no constitutional authority, express or implied, can be found in support of the PUC's assertion of power. This alone leads to a conclusion that the commission's act was ultra vires, but because of the importance of the issue it may be useful to explore underlying policy arguments sometimes advanced in an effort to justify the exercise of constitutional review by an administrative agency.

It may be urged that administrative agencies must be granted such power in order to avoid injustice in some cases. Obsolete and patently unconstitutional laws remain on the statute books, and according to this argument they should be removed by the governmental body with the first opportunity to do so. This is particularly desirable with regard to the

PUC, because the commission's decisions may be reviewed only by this court.

It is true that if the commission lacks constitutional review power, an invalid statute will remain in effect during the interval between the PUC decision and this court's reviewing opinion. But on the other hand a time lag will also occur when the commission, as in the present case, erroneously declares a law unconstitutional: during the period before this court reverses the commission, legislation duly enacted by the representatives of the people of California will not be enforced. (*Panitz* v. *District of Columbia* (D.C.Cir. 1940) *supra,* 112 F.2d 39, 41; *Barr* v. *Watts* (Fla. 1953) *supra,* 70 So.2d 347, 351.) The question, accordingly, is which time lag is the less undesirable: a period during which an unconstitutional law remains effective prior to court review, or a delay during which a valid legislative measure is rendered inoperative.

In a developing nation groping toward a constitutional form of government, the question might be debatable. But in our established democracy the resolution is not difficult. Laws passed by a legislature represent the will of the people, and courts in a democratic society are understandably reluctant to nullify that will. Consequently, in California as in all American jurisdictions, not only do courts presume that statutes are constitutional until clearly proven otherwise, but they normally will not decide constitutional challenges unless the responsibility is unavoidable. (*Marin Municipal Water Dist.* v. *Dolge* (1916) 172 Cal. 724, 726 [158 P. 187]; *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 5-6 [97 Cal.Rptr. 431].) When a court exercises such restraint, a statute of questionable validity may remain effective until revised by the Legislature or struck down in a later case in which the constitutional issue is unavoidable. But the belief is implicit in our system that any adverse effects of such a delay are less harmful than the consequences of a court's precipitous and erroneous decision that a statute is unconstitutional. A fortiori, the delay caused by an administrative agency's inability to render a decision on the constitutionality of a statute is preferable to the situation created by an erroneous administrative nullification of a legislative act.[1]

In addition, practical considerations militate against the grant of constitutional review power. When an administrative agency invalidates a statute, "the people (represented by the agency) are without a remedy. The agency has no standing to appeal to the courts since it made the

decision. The legislature is powerless to correct the error. One can imagine the Legislature enacting a statute to the effect that the 'first statute is constitutional.' " (Coan, *May a Hearing Officer Declare a State Law to be Unconstitutional* (1967) 4 Admin.L.Bull. 2, 3.)

This situation might also arise, of course, when a civil court deciding litigation between private parties invalidates a statute. Yet when a court undertakes constitutional review, there is reasonable assurance that it is aware of the gravity of its task. In order to qualify for service on the superior court or the appellate courts of this state, a person must have at least 10 years' experience as an attorney. (Const., art. VI, § 15.) In sharp contrast, there is no requirement that PUC commissioners have a law education or legal experience, and few do.[3] Certainly attorneys have no monopoly on wisdom, but a person trained for three or more years in a college of law and then tempered with at least a decade of experience within the judicial system is likely to be far better equipped to make difficult constitutional judgments than a lay administrator with no background in the law. Not only is a lawyer more apt to be intellectually prepared to decide constitutional questions, he is likely to be more disposed to exercise judicial restraint. It cannot seriously be disputed that judges, for all their individual faults, are more able than PUC commissioners, for all their individual virtues, to decide whether a law is unconstitutional. (See Davis, § 30.09, at p. 241.)

In summary, the action of the PUC cannot be justified from either a constitutional or policy standpoint. Declaring a statute unconstitutional "represents the highest exercise of judicial power and one even the judiciary is reluctant to exercise." (*Panitz* v. *District of Columbia* (D.C.Cir. 1940) *supra*, 112 F.2d 39, 41.) Our traditional reluctance to invoke the most awesome power in the spectrum of the judicial process should induce us to resist its assertion by a lay commission, which, for all its trappings of authority, is simply not a court of law.

Sullivan, J., concurred.

---

[3] While the PUC has a staff of attorneys to assist in the preparation of opinions, it is the commissioners, not the staff attorneys, who must make the final decisions.