TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 85-205 |
|  | : |  |
| of | : | FEBRUARY 11, 1986 |
|  | : |  |
| JOHN K. VAN DE KAMP | : |  |
| Attorney General | : |  |
|  | : |  |
| JOHN T. MURPHY | : |  |
| Deputy Attorney General | : |  |
|  | : |  |

_____


THE STATE BOARD OF EQUALIZATION has requested an opinion on the following question:

For purposes of the Moore Universal Telephone Services Act, are the revenues received by interLATA intrastate suppliers of telecommunications services for providing intraLATA intrastate telecommunications services included within taxable gross revenues?

CONCLUSION

For purposes of the Moore Universal Telephone Services Act, the revenues received by interLATA intrastate suppliers of telecommunications services for providing intraLATA intrastate telecommunications services are included within taxable gross revenues.

1

ANALYSIS

INTRODUCTION

The Moore Universal Telephone Act (Stats. 1983, ch. 1143, § 1 et seq.) provides for "lifeline" residential telephone service for needy individuals and families. This low-cost service is subsidized by the Universal Telephone Service Fund, established by the Moore Act, which is supported by a tax on the "gross revenues" of "service suppliers". The Moore Act is administered by the California Public Utilities Commission (CPUC) and the State Board of Equalization (SBE). The CPUC determines the scope of the telephone services provided, the service rates and the tax; the SBE supervises the tax reporting and collecting. (Pub. Util. Code, § 739.2; Rev. & Tax Code, § 44000 et seq.)

HISTORY

By the Moore Act the Legislature directed the CPUC to design a "lifeline" program of telephone service to meet the minimum residential communications needs of those unable to afford regular service, particularly the elderly, the handicapped and the infirm. (Pub. Util. Code, § 739.2, subd.(a).) The CPUC was also directed to set the "rates and charges for that service, and eligibility criteria for that service." (Pub. Util. Code, § 739.2, subd.(a).) Generally, the "lifeline" rate was not to be greater than 50 percent of the basic rate for measured service or for flat rate service, exclusive of federally mandated access charges, available to the residential subscriber. (Pub. Util. Code, § 739.2, subd.(b).) The CPUC was authorized to change the "lifeline" rate so established either specifically or pursuant to any general restructuring of all telephone rates, charges and classifications. (Pub. Util. Code, § 739.2, subd.(d).)

To finance this program a tax is imposed on "every service supplier in the state measured by the gross revenues received from intrastate telecommunication services provided on or after July 1, 1984." (Rev. & Tax Code, § 44030.) The tax rate is determined annually and is not to exceed 4 percent of the gross revenues received by a service supplier. (Rev. & Tax Code, §§ 44040 and 44041.) The term "service supplier" is defined as follows (Rev. & Tax Code, § 44016):

"'Service supplier' means any person supplying any of the following:

"(1) InterLATA intrastate telecommunications services.

"(2) IntraLATA intrastate telecommunications services if the commission [CPUC], after public hearings, determines that such

2

intraLATA intrastate telecommunications services shall be subject to the tax imposed under this part in accordance with the intent of the Legislature as set forth in Section 1 of the act enacting this section at the 1983-84 Regular Session of the Legislature.

"(3)  Intrastate telecommunications services on a basis not defined by LATA boundaries."

Before going further we must explain these words. A LATA is a local access and transport area as approved in the telephone divestiture proceedings.[1] (*United States* v. *Western Elec. Co., Inc*. (D.D.C. 1983) 569 F.Supp. 990; Rev. & Tax Code, § 44019.)  As explained in the above case, at pages 993-994 (fns. omitted):

"Pursuant to the decree, all Bell territory in the continental United States is divided into LATAs, generally centering upon a city or other identifiable community of interest.  Most simply, a LATA marks the boundaries beyond which a Bell Operating Company may not carry telephone calls. What the Operating Companies will do in the services field after divestiture is (1) to engage in exchange telecommunications, that is, to transport traffic between telephones located within a LATA, and (2) to provide exchange access within a LATA, that is, to link a subscriber's telephone to the nearest transmission facility of AT & T or one of AT & T's long-haul competitors.

"Once the divestiture is completed, the Operating Companies will be allowed to transport communications only to and from telephones and other apparatuses located within the same LATA (intra-LATA traffic); because of their local monopoly position, the decree does not permit the Operating Companies to carry calls between different LATAs (inter-LATA traffic). Only AT & T and its intercity competitors - such as MCI,  Sprint, and Satellite Business Systems - may carry  telecommunications traffic which originates in one LATA and terminates in another."

In short, interLATA means between one LATA and another and intraLATA means within a single LATA.  (Rev. & Tax Code, §§ 44020 and 44021.)

---

[1] In 1982, the American Telephone and Telegraph Company (AT & T) and the United States Department of Justice signed a consent decree divesting AT & T of subsidiaries supplying local telephone service.  (*United States* v. *American Tel. and Tel. Co.*, (D.D.C. 1982) 552 F.Supp. 131, 140-143, aff'd mem. sub. nom. *Maryland* v. *United States* (1983) 460 U.S. 1001.)

The Moore Act, in Revenue and Taxation Code section 44024, defines "gross revenues" as follows:

> "'Gross revenues' means all revenues billed by a service supplier for the provision of intrastate telecommunications services, including revenues derived from monthly service flat rate charges, message unit charges, toll charges, and intrastate wide area telephone service charges, and any other flat rate or usage charge, excluding all federal, state, and local taxes and all accounts which have been found to be worthless and written off for income tax purposes or, if the service supplier is not required to file income tax returns, written off in accordance with generally accepted accounting principles."

The term "intrastate telecommunication service" is then defined in Revenue and Taxation Code section 44025 as follows:

> "'Intrastate telecommunication service' means any of the following:
>
> "(a)   A telecommunication for which there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication, where the point of origin and the point of destination are located within this state.
>
> "(b)   A service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telecommunications to or from persons having telephone, data, or radiotelephone stations which are outside the exchange area in which the station provided with the service is located, where the point of origin and the point of destination are located within this state.
>
> "(c)   A service which entitles the subscriber, upon payment, to transfer or move information whether voice, data, digital, or video in nature where the point or points of origin and the point or points of destination of the service are located in different exchanges in this state."

In summary, the tax scheme imposes the tax upon the gross revenues from intrastate telecommunications services of the suppliers of interLATA intrastate telecommunications services and, if the CPUC so determines, upon the gross revenues

4

from intrastate telecommunications services of the suppliers of intraLATA intrastate telecommunications services.

In compliance with the Moore Act's directive, the CPUC initiated proceedings[2] and conducted hearings which resulted in Interim Opinion, decision 84-04-053, April 18, 1984. This opinion, inter alia, established a 4 percent tax on interLATA intrastate toll calls, stating that "although it [CPUC] has the power to do so it will not at this time tax intraLATA toll calls," and that "we [CPUC] may later have to include intraLATA intrastate services if the tax does not generate enough to fund the program." (Slip Opn., pp. 2 and 15.)[3]

On November 7, 1984, the CPUC issued Opinion on Establishing a General Order for Administration of the Moore Act, decision 84-11-028. By this opinion and general order (No. 153) the CPUC defined "service suppliers" so as to exclude intraLATA suppliers (Gen. Order No. 153, § 1.3.24):

> "'Service Supplier' - means any person supplying any of the following:

> "InterLATA intrastate telecommunication services.

> "Intrastate telecommunications services on a basis not defined by LATA boundaries."

The CPUC also defined "gross revenues" so as to exclude revenues for providing intraLATA services (Gen. Order No. 153, § 1.3.8):

> "'Gross revenues' means all revenues billed by a service supplier for the provision of intrastate interLATA telecommunications services, excluding all federal, state, and local taxes and all accounts which have been found to be worthless and written off for income tax purposes or, if the service supplier is not required to file income tax returns, written off in accordance with generally accepted accounting principles."

---

[2] "Investigation on the Commission's own motion into the method of implementation of the Moore Universal Telephone Services Act," OII 83-11-05, November 30, 1983.

[3] The tax was also placed on revenues from "intrastate services not defined by LATA boundaries". (Slip Opn., p. 15; see Rev. & Tax Code, § 44016, subd. (3).) Discussion of this provision is not relevant to our opinion.

5

By this action the CPUC excluded from the tax any gross revenues from intraLATA intrastate telecommunications services furnished by interLATA intrastate suppliers. (See also interim opinions 84-11-028, 85-05-009 and 85-08-083.)

Some additional history must be examined to explain this exclusion. In a separate but related proceeding[4], by decision 84-06-113, June 13, 1984, the CPUC generally prohibited interLATA intrastate suppliers from providing intraLATA services. (Slip Opn., pp. 98-104.) However, this decision did not preclude interLATA intrastate suppliers from furnishing certain high-speed intraLATA data services over private line networks or certain "incidental" intraLATA services. (Slip Opn., pp. 67-72a, 99-104.) This latter exception arose because of the present technical inability of some interLATA intrastate suppliers to identify all intraLATA traffic of their customers and block such traffic from their systems. (Slip Opn., pp. 8-9, 69-72a.) Consequently, some interLATA intrastate suppliers do receive revenues from intraLATA services which they have been allowed to provide.

PROBLEM

Revenue and Taxation Code section 44016, subdivision (1), makes a supplier of interLATA intrastate telecommunications services subject to the tax. The tax is measured by gross revenues, which term under the Moore Act covers "all revenues billed by a service supplier for the provision of intrastate telecommunications services," a measurement which would encompass both interLATA revenues and intraLATA revenues. (Rev. & Tax Code, §§ 44024 and 44030.) On its face the Moore Act makes all the intrastate telecommunications services revenues of the interLATA intrastate suppliers subject to the tax.

The CPUC, exercising authority as perceived by it under Revenue and Taxation Code section 44016, subdivision (2), determined that intraLATA intrastate telecommunications services were not to be taxed under the Moore Act. It also determined, that "gross revenues" mean only revenues billed by a service supplier for the provision of interLATA intrastate telecommunications services. This definition differs from the definition of "gross revenues" set forth in Revenue and Taxation Code section 44024. The problem, then, is whether an interLATA intrastate supplier must pay the tax on intraLATA revenues.

---

[4] "Order Instituting Investigation to determine whether competition should be allowed in the provision of telecommunications services within the state," OII 83-06-01, June 29, 1983.

6

RESOLUTION

The Moore Act is of recent origin and has not been judicially construed. In examining the act we will follow several principles of statutory construction used by courts. The primary rule is to "'ascertain the intent of the Legislature so as to effectuate the purpose of the law.'" (*People* v. *Davis* (1981) 29 Cal.3d 814, 828.) In determining legislative intent, we first turn to the language used, giving the words their usual and ordinary import. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698; *People* v. *Belleci* (1979) 24 Cal.3d 879, 884.) "Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230.) Also, great respect must be given to an administrative agency's interpretation of the statute it is charged with enforcing. (*San Lorenzo Education Assn.* v. *Wilson* (1982) 32 Cal.3d 841, 850.) On the other hand, an administrative agency may not "rewrite the statute to suit its notion of what the Legislature must have intended. . . ." (*Regents of University of California* v. *Public Employment Relations Bd.* (1985) 168 Cal.App.3d 937, 944-945; *Daley* v. *State Dept. of Social Services* (1969) 276 Cal.App.2d 801, 804.)

The Moore Act is rooted in the Legislature's "plenary power" to confer additional authority and jurisdiction upon the CPUC beyond that conferred by the California Constitution. (Cal. Const., art. XII, § 5; see *County of Inyo* v. *Public Utilities Com.* (1980) 26 Cal.3d 154, 160.) The question of whether the Legislature has made the gross revenues from intraLATA intrastate telecommunications services of interLATA suppliers subject to the tax is a question of law, and such a question is reviewable. (*Cal. Portland Cement Co.* v. *Public Util. Com.* (1957) 49 Cal.2d 171, 175.)[5] While the CPUC's "interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purpose and language . . . ." (*Greyhound Lines, Inc.* v. *Public Utilities Com.* (1968) 68 Cal.2d 406, 410-411), it may not "disregard other laws representing the legislative policy of the state . . . ." (*Sale* v. *Railroad Commission* (1940) 15 Cal.2d 612, 621). We believe the CPUC has misinterpreted provisions of the Moore Act in the Revenue and Taxation Code.

Under Revenue and Taxation Code section 44030, as we have seen, the tax is "measured by the gross revenues received from intrastate telecommunications services . . . ." Under section 44016, subdivision (1), interLATA carriers are service suppliers subject to the tax as so measured by section 44030. (See also Rev. & Tax Code,

---

[5] Orders and decisions of the CPUC are reviewable in the California Supreme Court. (Pub. Util. Code, § 1756.) Review is confined to whether the CPUC has regularly pursued its authority or whether its order or decision violated constitutional rights. (*Southern Pac. Transportation Co.* v. *Public Utilities Com.* (1976) 18 Cal.3d 308, 311-312, fn. 2.)

7

§ 44025, defining "gross revenues.")  The CPUC cannot rewrite this tax scheme to change the tax measurement from revenues from all intrastate services to revenues billed for the provision of interLATA intrastate services only.

The Legislature in section 44016 made a clear distinction between the suppliers of interLATA services and the suppliers of intraLATA services.  It determined that the former should be taxed, giving the CPUC no discretion in the matter.  However, whether the latter would be taxed was made dependent on future CPUC action.  It is our view that the Legislature in identifying intraLATA service suppliers was pointing out those which supply only intraLATA services, as described in the modified final judgment in the telephone divestiture case.  (See *United States* v. *American Tel. and Tel. Co.*, *supra*, 552 F.Supp. 131, aff'd mem. sub. nom. *Maryland* v. *United States* (1983) 460 U.S. 1001.)  The Legislature was aware that upon divestiture the former Bell Operating Companies were authorized to provide service only within the LATA boundaries created by the divestiture. (*Id*., pp. 227-228.)  The Legislature in section 44016, then, was distinguishing these companies from other telecommunications suppliers authorized to operate in interLATA capacities (and interstate capacities) but not forbidden by reason of the divestiture from furnishing intraLATA services as well.  Accordingly, the Legislature intended and so directed that the tax be imposed on all the intrastate (both interLATA and intraLATA) revenues of the companies offering interLATA services.

Moreover, subdivision (2) of section 44016 allows the CPUC to exempt from the tax the service suppliers of "intraLATA intrastate telecommunications services" if the CPUC determines that "*such* intraLATA intrastate telecommunications services" should not be taxed. (Emphasis added.)  The word "such" refers back to the services of the intraLATA suppliers identified in subdivision (2) and not to the services of interLATA suppliers identified in subdivision (1) of section 44016.  (See *People* v. *School District* (1894) 101 Cal. 655, 658; *Estate of Wallace* (1950) 98 Cal.App.2d 285, 289-290.)  Consequently, the CPUC's discretion was limited to excluding the intraLATA revenues of intraLATA suppliers only.

For the above reasons we conclude that for purposes of the Moore Universal Telephone Services Act the revenues received by interLATA intrastate suppliers of telecommunications services for providing intraLATA intrastate telecommunications services are included within taxable gross revenues.

*****

8