[No. S002757. Sept. 22, 1988.]

DUDLEY REESE et al., Plaintiffs and Respondents, v. KENNETH KIZER, as Director, etc., et al., Defendants and Appellants.

**COUNSEL**

John K. Van de Kamp, Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Defendants and Appellants.

Evelyn R. Frank, Richard A. Rothschild, Mark Greenberg and Gail Wetzel for Plaintiffs and Respondents.

**OPINION**

**BROUSSARD, J.—** ■ The issue presented is whether consistent with article III, section 3.5, subdivision (c) of the California Constitution the

Legislature may direct an administrative agency, in effect, to implement a statute to the extent it does not conflict with federal law.[1] We conclude that such directions are permissible and do not frustrate the purpose of the constitutional provision, which is to limit the power of administrative agencies to refuse to carry out legislative mandates.

This question, one of first impression, has profound implications for the state's participation in a number of joint federal-state programs, such as the Food Stamp program (7 U.S.C. § 2011 et seq.; Welf. & Inst. Code, § 18900 et seq.), aid to families with dependent children (AFDC; 42 U.S.C. § 601 et seq.; Welf. & Inst. Code, § 11250 et seq.) and Medicaid, known in California as Medi-Cal (42 U.S.C. § 1396 et seq. (Medicaid Act); Welf. & Inst. Code, § 14000 et seq. (Medi-Cal Act)). To assure the continued availability of federal funds for these programs the state must operate plans which conform to the governing federal statutes and regulations. As these myriad guidelines are subject to constant change, the state plans must remain flexible in their application or risk running afoul of federal rules. To accomplish this purpose, the state statutes governing the operation of these plans contain numerous provisions which call upon the administering state agency to determine the impact of federal law and federal regulations and to avoid doing anything which would create a conflict therewith. (See, e.g., Welf. & Inst. Code, §§ 11250.6, 11250.7 [providing for the proration of income received by contract employees and certificated school district employees, respectively, for purposes of AFDC eligibility "[e]xcept where inconsistent with federal laws"], 18901 [providing for determination of households' eligibility to participate in the federal Food Stamp program "to the extent permitted by federal law"].) Such a provision is involved in the present case.[2]

Welfare and Institutions Code section 14005.16 (referred to hereinafter as section 14005.16), a provision of the Medi-Cal Act, provides in pertinent part that for the purposes of determining eligibility for benefits the only

---

[1] Article III, section 3.5 provides: "An administrative agency, including an administrative agency created by the Constitution or an initiative statute, has no power: [¶] (a) To declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional; [¶] (b) To declare a statute unconstitutional; [¶] (c) To declare a statute unenforceable, or to refuse to enforce a statute on the basis that federal law or federal regulations prohibit the enforcement of such statute unless an appellate court has made a determination that the enforcement of such statute is prohibited by federal law or federal regulations."

[2] With respect to the statute in question, subsequent events have rendered the issue moot. (See post, fn. 6.) Nevertheless, the opinion below casts doubt on the validity of a broad range of provisions—such as those just cited —governing the state's participation in various joint federal-state endeavors, thus raising an issue of fundamental and continuing importance which merits the attention of this court. For that reason, rather than dismissing defendants' petition we have chosen to address the question presented.

income to be considered "available" to a married person residing in a nursing home or other long-term care facility is his or her community property interest in the combined income of the couple.[3] When this provision was enacted in 1983, the prevailing practice under federal Medicaid regulations was to count as "available" all income received in the institutionalized individual's name. Since the typical elderly married couple receives most if not all of its income in the name of the husband, the effect of this practice was that if the husband went into long-term care the amount the couple must spend in order to qualify for assistance under the program might represent the greater part of their combined income, leaving the noninstitutionalized wife much poorer than her husband would be were it she and not he who was in long-term care.[4] (See *Dept. of Health, State of Cal.* v. *Secretary of HHS* (9th Cir. 1987) 823 F.2d 323, 326; see also *Granneman* v. *Myers* (1981) 115 Cal.App.3d 846, 851-852 [171 Cal.Rptr. 583] [observing in dictum that a Medi-Cal regulation providing that " '[i]ncome is considered to belong to the person who is (1) [n]amed on a negotiable instrument, (2) . . . given cash, . . . [or] (3) [w]ho receives the income in kind' " in effect penalized the plaintiff for remaining married to her husband by directing the Department of Health Services (DHS) to treat her community property share of an annuity which was the couple's sole source of income as if it belonged entirely to him].) Section 14005.16 was an attempt by the Legislature to correct this imbalance.

Recognizing the possibility that the use of community property principles as set forth in the new statute might be in conflict with federal law, the Legislature provided in an uncodified section of the same enactment: "(a) Any provision of this act that is in conflict with any federal statute or regulation shall be inapplicable to the extent of such conflict, but the provision and the remainder of the provisions shall be unaffected to the extent no conflict exists. [¶] (b) The State Department of Health Services shall . . . seek all federal waivers necessary to implement the provisions. The provisions for which appropriate federal waivers cannot be obtained shall not be implemented, but provisions for which waivers are either obtained or found to be unnecessary shall be unaffected by the inability to obtain federal waivers for the other provisions. . . ."[5] (Stats. 1983, ch. 1031, § 2, p. 3616, referred to hereinafter as section 2.)

---

[3] Under the federal Medicaid Act (42 U.S.C. § 1396 et seq.), if the income "available" to an otherwise eligible applicant exceeds the maximum level for eligibility under the program, the applicant may qualify for benefits only after "spending down" his or her income to the eligibility level. Under the Medi-Cal Act, this monthly "spenddown" amount is known as the applicant's "share of cost." (Welf. & Inst. Code, §§ 14005.7, subd. (b), 14054.)

[4] At the time of plaintiffs' suit, the noninstitutionalized spouse's allowance for purposes of calculating the institutionalized spouse's share of cost was $484 per month.

[5] Under 42 United States Code section 1315(a), the Secretary of Health and Human Services may grant a discretionary waiver of the standards generally applicable to state Medi-

Pursuant to the directive contained in section 2, defendant Kenneth Kizer's predecessor, Peter Rank, then director of defendant DHS, wrote a letter to the associate regional director of the Health Care Financing Administration (HCFA) of the United States Department of Health and Human Services (HHS), requesting a waiver of the federal regulations governing the treatment of income of institutionalized individuals for determining Medicaid eligibility. The letter explained that the purpose of the request was to allow DHS to begin counting only the community property share of income of a spouse in long-term care in calculating his or her share of cost for receiving Medi-Cal benefits, pursuant to recently enacted section 14005.16. The HCFA denied the request, explaining that the Secretary of HHS (Secretary) was without authority to waive federal regulations for the purpose of allowing a state to employ community property rules in calculating income for determining Medicaid eligibility. As a result, DHS did not implement section 14005.16.

Plaintiffs are three women, and the husband of one of them, whose husbands at the time the complaint was filed were in long-term care and receiving Medi-Cal. They brought a class action demanding implementation of section 14005.16 notwithstanding DHS's determination that the statute was in conflict with federal law and regulations as interpreted by the Secretary. They also sought payment of retroactive benefits under the statute. The superior court granted plaintiffs' request for a preliminary injunction, and their subsequent motion for summary judgment. Defendants appealed.[6]

---

caid programs where a state proposes an "experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of [the Medicaid Act] . . . ."

[6] While defendants' appeal was pending, the Legislature repealed section 2 and, in another uncodified statute, directed DHS to adopt emergency regulations to implement section 14005.16, as amended. (Stats. 1985, ch. 1221, pp. 4157-4161.) Like the one it replaced, the new statute provided that any provision of the act would be inapplicable to the extent it was in conflict with federal law. Rather than direct DHS to seek waivers before proceeding with implementation, however, it dictated that "[n]o provision of this act shall be considered to be in conflict with any federal statute or regulation until after a final determination of the Secretary of [HHS], made pursuant to [42 United States Code section 1316(a)(3)], finding such a conflict." (Stats. 1985, ch. 1221, § 6, subd. (a).) It further provided: "In the event of [such a determination, DHS] shall immediately request the Attorney General of California to seek judicial review of the determination, and shall immediately notify the appropriate policy and fiscal committees of both houses of the Legislature." (Stats. 1985, ch. 1221, § 6, subd. (b).) Pursuant to this new directive, DHS filed a plan amendment with the Secretary, who made a final determination that section 14005.16 was in conflict with federal law. DHS appealed the determination to the federal Ninth Circuit Court of Appeals, as provided in 42 United States Code section 1316(a)(3). That court, following its opinion in *State of Washington* v. *Bowen* (9th Cir. 1987) 815 F.2d 549 (holding that the "name on the check" method of attributing income for public assistance eligibility purposes is not mandated by federal law, and that there is no conflict where a state chooses to employ its own community property rules instead), reversed the Secretary's determination, and held that section 14005.16 could be implemented without endangering the program's federal funding. (*Dept. of Health, State of Cal.* v. *Secre-*

The Court of Appeal affirmed both the preliminary injunction and the judgment granting retroactive benefits. The court found that by its plain language, subdivision (c) of article III, section 3.5 of the state Constitution (*ante,* fn. 1; referred to hereinafter as article III, section 3.5) places a limitation on the power of agencies to determine the validity of state statutes under federal law. Furthermore, it found the Legislature powerless to instruct an agency to perform an act which violates this express limitation. (See Cal. Const., art. I, § 26 ["The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise."]; *People* v. *City of San Buenaventura* (1931) 213 Cal. 637, 639-640 [3 P.2d 3] ["This declaration applies to all sections of the Constitution alike, and is binding upon any department of the state government, legislative, executive or judicial. [Citation.]"]; accord *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 460-461 [343 P.2d 8]; *Unger* v. *Superior Court* (1980) 102 Cal.App.3d 681, 685 [162 Cal.Rptr. 611], cert. den. 449 U.S. 1131 [67 L.Ed.2d 118, 101 S.Ct. 952].) The court construed section 2 as giving DHS the power to determine independently that section 14005.16 was in conflict with federal law and to refuse to enforce it on those grounds. Finding such a grant of power to be unconstitutional, it held that section 2 was void *ab initio*.

The court reasoned that the terms of section 14005.16 and section 2 placed DHS in an untenable position, as the agency could not obey either provision without disobeying the other, and without, in either case, violating article III, section 3.5. "If, on the one hand, DHS followed the statutory directive of section 2 . . . it would not enforce the provisions of [section] 14005.16 without first determining whether those provisions were in conflict with federal law or regulation. Thus, the agency would be placed in the position of violating subdivision (c) of article III, section 3.5, because no appellate court had yet determined whether such conflict existed and the agency is constitutionally required to enforce the provisions until such time as that appellate determination is made. [¶] If, on the other hand, the agency refused to follow the statutory directive contained in section 2 . . . on the grounds that the Legislature was constitutionally prohibited from ordering the agency not to immediately implement section 14005.16, then the agency would be placed in the position of violating subdivision (a) of article III, section 3.5, in that no appellate court had determined the statute to be unconstitutional." Having found section 2 to be without force or effect, the court held that DHS had no choice but to implement section 14005.16 as though the uncodified provision had never been enacted and without regard for any apparent conflict with federal law.

*tary of HHS, supra,* 823 F.2d 323, 327.) That ruling recently became final, and defendants have indicated that they intend to pay all retroactive benefits sought by plaintiffs. (See *ante,* fn. 2.)

Unlike the Court of Appeal, we construe section 2 not as empowering DHS to determine independently whether section 14005.16 was in conflict with federal law, but rather as directing the agency to effectuate the statute to the maximum extent allowed under federal law as determined by the relevant federal authorities. As such, the enactment implicated none of the restraints contained in article III, section 3.5.

Article III, section 3.5, which was enacted by the voters in 1978, was placed on the ballot by a unanimous vote of the Legislature in apparent response to this court's decision in *Southern Pac. Transportation Co.* v. *Public Utilities Com.* (1976) 18 Cal.3d 308 [134 Cal.Rptr. 189, 556 P.2d 289], in which the majority held that the Public Utilities Commission had the power to declare a state statute unconstitutional. (18 Cal.3d at p. 311, fn. 2; see *Regents of University of California* v. *Public Employment Relations Bd.* (1983) 139 Cal.App.3d 1037, 1041-1042 [189 Cal.Rptr. 298]; Ballot Pamp., Primary Elec. (June 6, 1978) pp. 24-27 [Prop. 5 analysis and arguments].) The purpose of the amendment was to prevent agencies from using their own interpretation of the Constitution or federal law to thwart the mandates of the Legislature. Its language, however, cannot reasonably be construed to place a restriction on the authority of the Legislature to limit the scope of its own enactments.[7] By limiting the implementation of a statute as directed by the Legislature, an agency neither "declares it unenforceable" nor "refuses to enforce it." Indeed, far from thwarting the Legislature's mandate, such action precisely fulfills it.[8]

As noted *ante,* page 998, a provision such as the one contained in section 2 is often the only way the Legislature can assure the validity of a statute under federal law while at the same time assuring that the policy underlying the statute will be effectuated to the maximum permissible extent. The notion cannot be seriously entertained that when the Legislature placed article III, section 3.5 before the voters it intended that such provisions should be invalidated. Nonetheless, this is the implication of the holding below.[9]

---

[7] Nothing in the material submitted to the voters suggests that the amendment was intended to act as a restriction on legislative powers. Rather, the proponents of the measure argued that it would "insure that appointed officials do not refuse to carry out their duties by usurping the authority of the Legislature and the Courts. . . . [P]assage of [the amendment] will help preserve the concept of the separation of powers so wisely adopted by our founding fathers." (Argument in favor of Prop. 5, Ballot Pamp., *supra*, p. 26.)

[8] It makes no difference whether the limiting provision is to be found in the wording of the subject statute itself or, as here, in a separate section or enactment. In either case the statute's substantive provisions must be read with reference to the limitations placed upon them by the Legislature.

[9] Plaintiffs take the position that the Court of Appeal did not invalidate section 2 in its entirety, but only subdivision (b), which directed DHS to "seek all federal waivers necessary" to implement section 14005.16 and to refuse to enforce the provision to the extent it could

Such an interpretation of article III, section 3.5 produces absurd results, as demonstrated by the facts in this case. Here the Legislature determined that the change it sought in the Medi-Cal eligibility rules was in conflict with federal law as interpreted by the Secretary of HHS. Fearing that the unconditional enactment of such a new rule might jeopardize the state's participation in the program, the Legislature sought a way to circumvent that prevailing interpretation without endangering its federal funding base. There were various ways to attempt this, including the plan amendment and appeal process which it finally pursued. No approach was assured of success, however, and rather than mount a frontal attack it appears the Legislature preferred to direct DHS initially to seek a discretionary waiver of the applicable plan requirements. This tactic failed, and hindsight indicates that the desired result could have been achieved sooner had the state adopted a more aggressive strategy at the outset. Still, it would be ludicrous to hold that the Legislature, while free to make no move at all in the direction of reforming the law, is precluded by the Constitution from proceeding in that direction with caution.

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Mosk, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

---

not obtain such waivers. According to plaintiffs, subdivision (a) (directing that "[a]ny provision of [section 14005.16] that is in conflict with any federal statute or regulation shall be inapplicable to the extent of such conflict . . .") and provisions like it (see statutes cited *ante,* p. 998 are easily squared with article III, section 3.5, in that their language can be construed to mean that the subject statute shall be considered invalid only to the extent there is a conflict with federal law as interpreted by an appellate court, not as determined by a "federal bureaucrat." Plaintiffs' stance is unavailing, since even the provisions they purport not to challenge routinely require agencies to abide by administrative and other nonappellate interpretations of federal statutes and regulations.